# JAMES MURPHY

## *v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

1. BILL OF EXCEPTIONS — *when necessary.* Affidavits of a sheriff and clerk concerning an alleged irregularity in summoning a petit jury, will not be considered in the Supreme Court unless they are made a part of the record by bill of exceptions.

2. JURY — *whether venire for one week can be served for another.* On the trial of a party upon the charge of murder, the defendant moved to quash the venire for the petit jury, upon the ground of an alleged irregularity in summoning the same, in this: that the venire was issued for jurors selected by the board of supervisors for the third week of the term, and the sheriff, by request of the circuit judge, executed the venire for the second week, and the defendant was thereby compelled to select a jury from a panel not chosen for the week in which he was tried. The alleged irregularity did not properly appear of record, but the court said they were not prepared to hold that such a change, if made, would be ground for reversal.

3. JURY — *when juror over sixty years of age — whether ground of challenge.* That a juror is over sixty years of age does not disqualify him; it is an exception or privilege of which he alone can avail himself. It is not ground of challenge by either party. The rule in *Davis* v. *The People,* 19 Ill., 74, adhered to.

4. EVIDENCE — *dying declarations.* Upon the prosecution of a party on the charge of murder, the statement of the deceased was introduced as his dying declaration. As a foundation for its introduction, it was shown that the statement was taken down on the day preceding his death, and was sworn to. At the time, the wounded man expressed no opinion as to whether death was impending, except by nodding assent when told he would have to swear he had no hope of life. He had been told by his physician that he could not recover, upon his inquiry whether there was any hope. He partook of the last rites of his church before making the statement. He was under the influence of morphine, and had to be aroused sometimes to get his attention while the statement was being taken. The statement was partly voluntary, and portions of it drawn out by questions to which he sometimes answered and sometimes only nodded assent. The statement was not taken down in his own language, but substantially so. He had made no disposition of his property. The statement was read to him after it was written, and he said it was substantially correct. It was regarded that the condition of mind of the declarant in regard to any hope of recovery, and the manner in which his statements were taken, entitled them to be admitted to the jury as his dying declarations.

5. But on account of his condition, his statements were not entitled to much weight, and would not, alone, sustain a verdict of guilty, even of manslaughter.

6. CRIMINAL LAW—*malice implied—burthen of proof.* Upon the trial of a party upon the charge of murder, it being proven that he inflicted the mortal wound, the law implies the malice, and it devolves upon him to show the justification or mitigation, to reduce it from murder or to obtain an acquittal, unless the whole circumstances show that it was not accompanied with malice.

7. SAME—*of justifiable homicide.* It cannot be said that a man doing all within his power to take the life of another with a gun, is justified in so doing, because the person assailed endeavors simply to dispossess the assailant of the weapon as a means of preserving his own life, although it may have contributed, unintentionally, to the discharge of the gun.

8. INSTRUCTIONS—*when a portion of a series are improper, may be corrected by others.* As a general rule, instructions depend upon themselves, but when a series are taken together, some of which are incorrect in themselves, may be so explained by others as to render them free from objection.

9. SAME—*may be refused if already given.* When a legal principle has once been announced in an instruction, there is no necessity for its repetition, and it is not error to refuse to give it in a second instruction.

10. SAME—*must be relevant..* It is not error to refuse an instruction when there is no evidence tending to support the hypothesis upon which it is based.

WRIT OF ERROR to the Circuit Court of Kane county; the Hon I. G. WILSON, Judge, presiding.

James Murphy was indicted in the court below, at the October term, 1863, for the alleged murder of William Shies.

The cause was tried at the February term, 1865. The court convened for that term on the 6th day of February, and on the 21st of the same month, the case was called for trial. Before the empanneling of the jury, the defendant moved the court to quash the *venire,* upon the ground that the jurors were selected by the board of supervisors, and the writ of *venire facias* issued commanding that they be summoned to attend the second week of the term, whereas the sheriff, without proper authority, and at the request of the circuit judge, summoned the jurors named therein to attend at the third week of the term, so that

the defendant would thereby be compelled to select a jury from a panel chosen for a different week from that in which he was to be tried. The court overruled the motion, and exception was taken.

The call of the jury was then proceeded with, and among those called was *Samuel Pennock*, who, upon being examined, stated that he was over sixty years of age. The defendant thereupon proposed to challenge the juror for that cause, but the court ruled that the age of the juror was no cause for challenge, and the defendant excepted. The defendant then challenged the juror peremptorily.

The jury being empanneled, the cause proceeded to trial.

The principal circumstances attending the homicide were substantially as follows :— On the evening of the 23d of August, 1863, Shies, the deceased, and a man by the name of McDonald, who was deaf and dumb, were sitting in the saloon of one Rang, in Aurora, conversing with each other in writing. While thus occupied, Murphy, the accused, came into the saloon, and approaching Shies, made some remark to him which was not heard by the witnesses. Shies told him not to say anything to him while he was busy writing. Myrphy thereupon, at the request of the proprietor of the saloon, immediately left the room. In ten or fifteen minutes afterwards, Shies and McDonald left the house. In a short time, McDonald returned to the saloon, indicating that he wished the persons present to follow him; they did so, and found Shies prostrate in the middle of the road, and Murphy on him. The parties were separated, Murphy appearing angry at the interference, and went to his house some little distance away and procured a gun. Shies in the meantime followed in the same direction, and approaching Murphy, who was in or near his own gate, said he wished to speak to him and explain and be friendly. Murphy responded, telling him not to approach any nearer, and the gun immediately went off, shooting Shies, causing his death

29

on the fourth day afterwards. It seems at the time, or just preceding the shooting, Shies held the muzzle of the gun, trying to push it one side. Some evidence was introduced to show that Murphy apprehended an attack at the time Shies approached him at his house, and many details of the circumstances are given, which it is not material to the case here to mention.

During the trial, the prosecution proposed to introduce in evidence certain statements made by Shies concerning the occurrence, as his dying declaration, and to lay the foundation therefor, presented the testimony of *Dr. C. D. Howell*, who testified as follows: I am a physician; I called to see Shies the night he was wounded; his bowels were protruding; it was a ragged, lacerated wound through the walls of the abdomen; there was no hope of his recovery; he asked me at the time if there was any chance, and I told him none at all; he died four days after; I was present · on the day preceding his death, when he made his dying declarations; a part of it is in my hand writing; the paper now shown me is according to his statement.

*Searles* testified that he also was present at the time of taking the dying declarations of Shies, and swore him to them after they were written out. He stated that he commenced writing himself, but was excited, and asked Mr. Metzner to finish it, which he did. He said that Shies made all the statements contained in the paper, and that it was read over to him after it was written, by whom he was not certain.

*Metzner* was also present. He said that Searles was nervous and requested him to draw up the formal part of the declaration of Shies, which he did. He read the statement to him after it was written. Shies did not sign his own name to it, he was too far gone. He requested him to make a statement of the facts, telling him we wanted to use it as his dying declaration; he would go on, then rest—waited several

minutes before he would respond with another sentence. The statement was partly made upon his own suggestion and partly by interrogatories. The witness could not distinguish between the portion that was voluntary and that which was drawn out by questions. In taking down the statement, he did not use Shies' language, but the substance was his. That portion relating to his death was more his language than the witness'. When the declaration was read to him, he said it was substantially correct. Shies, at the time, did not express any hope of life or certainty of death. When witness wrote the caption, he told Shies he would have to state, under oath, that he had no hope of life. To this he did not answer, but nodded assent. Witness thought Shies had made no disposition of his property. While the statement was being taken, he seemed to be under the influence of morphine—would now and then fall asleep, hesitate and nodded assent. When asked if the declaration contained the substance of facts he nodded assent.

*Dr. Howell*, reëxamined, said at the time the declaration was taken, Shies' mind, he thought, was clear; thought he had no difficulty in understanding questions or what was said. The cause of his hesitancy was over excitement. Witness could discover no incoherence in the statement taken down. Witness thought Shies inquired of him about that time if he had any chance of recovery, and he told him he had none. Shies expressed no opinion as to his condition, but asked witness how long he would probably live. A clergyman attended him at one time during his illness, and administered the sacrament to him. Witness said he was not present at the time the statement was made.

The State's attorney then offered in evidence to the jury the written statement of Shies, spoken of by the witnesses, as his dying declaration. The defendant objected; the court overruled the objection, and exception was taken.

The declaration of Shies was as follows:

STATE OF ILLINOIS, } ss.
    KANE COUNTY.

I, William Shies, of the county of Kane, State of Illinois, having no hope of life, and having the fear of God before me, do declare this to be a true statement of facts of an occurrence hereinafter related:

On the evening of the 23d day of August, A. D. 1863, myself and one McDonald started for home; I went to accompany him. When we were going by the house of James Murphy, said Murphy came running out of the house into the road with a hickory club. He struck Dummy with a club on the sidewalk, in front of Murphy's house; he then knocked down Dummy with a hickory club. After he struck Dummy with a club, I clinched the Irishman, to prevent his striking him again; we then had a struggle together. Dummy got up as quick as he could, and went to Fred Rang's for help. I called Dummy back, fearing the Irishman would hurt me, as he was too strong. When Dummy came back from Rang's, Rang came with him; the Irishman at that time had me down; Rang took the Irishman off from me; the Irishman then ran into his house and got his gun, and came out in the street again; I stepped toward him and told him I wanted to talk with him; he said I must not come near him as the gun would go off; I said to him, "What have I done to you that you treat me in this way?" and that I did not want to hurt him; I saw the gun in his hand at this time; I was in reach of the gun, and tried to push it away, as I saw that he was going to shoot me, but could not; he then shot me in the bowels; I never had any difficulty with the Irishman before; his name is James Murphy.

Sworn and Subscribed, etc., and signed by four witnesses.

The instructions given on both sides were voluminous, and being spoken of in the opinion as a series, objectionable features in some corrected in others, and no important doctrines to be drawn from them, it would subserve no valuable purpose to insert them here.

The following are the first, second, eighth and ninth instructions asked by the defendant and refused by the court:

1. If the jury believe, from the evidence, that Murphy, at his own gate, had a loaded gun in his hands, for the purpose of defending himself from a real or fancied assault of Shies, or his comrades, and Shies hold the muzzle of the gun, and in a struggle or controversy over the gun, or for the possession of it, or to turn it aside, Shies thereby in any manner contributed to the discharge of the gun, and that the gun went off and wounded Shies, of which wound Shies died, then the jury must acquit Murphy; and if, from all the evidence in the case, there is a reasonable doubt whether or not such is really the fact in the case, the jury should acquit, it being the duty of the jury to give the defendant the benefit of every reasonable doubt.

2. If the jury believe, from the evidence, that both Shies and Murphy had a struggle about a gun, and in that struggle the gun went off and wounded Shies, of which wound Shies died, and that that struggle contributed in any degree to the discharge of the gun, then the jury should find for the defendant; and if there is a reasonable doubt, based upon and growing out of the evidence, whether or not such was the fact, then the defendant is entitled to the benefit of that doubt, and then the jury should acquit.

8. If, from the evidence, it is uncertain in the minds of the jury whether the discharge of the gun spoken of in the case was the sole act of Murphy, or was the joint act of Murphy and the deceased, then they must find the prisoner not guilty.

9. If the jury believe, from all the evidence in this case, that Murphy had hold of one end of the gun in question, and Shies, the deceased, the other, and in a struggle over the gun for the possession, and then if the gun in question went off and killed Shies, and that the struggle over the gun was the real cause of the discharge of the gun, then in that case the jury should acquit.

Five other instructions were asked by the defendant, and refused, but are regarded as having been embraced in those already given.

The jury returned a verdict of guilty of manslaughter, and fixed the term for the confinement of the defendant in the penitentiary at twenty-five years.

The defendant thereupon moved for a new trial and in arrest of judgment, and in support thereof presented the affidavits of the clerk of the County Court and sheriff, which are not preserved, however, in the bill of exceptions.

Affidavit of the clerk of County Court of Kane county, and *ex-officio* clerk of Board of Supervisors; has been for three years; says that it has been the practice of the Board of Supervisors to select such individuals for grand and petit jurors for the Circuit Court of Kane county as each member saw fit from his town. Said names were given to the clerk, and he issued a venire to the sheriff of Kane county to summon said persons. Stated that in no other manner have they been selected.

Affidavit of the sheriff, states that he received venire in apt time to serve for the third week of term from proper clerk. That instead of serving the same as commanded in said venire, he, as he supposed he had a right to do, so far as he did serve the same, summoned the said jurors to appear on the second week of said term. That he did so at the request of I. G. Wilson, Judge of said court.

The court overruled the motions, and the defendant excepted. Judgment was entered upon the verdict, and thereupon the defendant sued out this writ of error.

The following are the errors assigned:

1. The court erred in not sustaining the defendant's challenge to the array of jurors, and quashing the venire.

2. The court erred in not sustaining the defendant's challenge for cause to the juror, Pennock.

3. The court erred in admitting the dying declaration of Shies.

4.   The court erred in giving plaintiff's instructions, and each of them.

5.   The court erred in refusing defendant's instructions, and each of them.

6.   The verdict is contrary to law and evidence.

Mr. B. F. PARKS for the plaintiff in error.

Mr. CHARLES BLANCHARD, State's attorney, for the people.

Mr. CHIEF JUSTICE WALKER delivered the opinion of a majority of the court:

It is insisted that the court below erred in refusing to quash the venire for the petit jury. That a panel was chosen, and a *venire facias* was issued requiring the attendance of the jurors on the third week of the term, whilst it was afterwards changed, without authority, requiring their attendance on the second week, and they were summoned and attended at the latter named time. And that accused was thereby compelled to select a jury from the panel chosen for a different week than that on which he was tried. The court was convened on the 6th day of February, 1865, and the trial commenced on the 21st day of that month. It thus appears that the trial was had during the third week of the term. But the affidavits of the sheriff and the clerk are not made a part of the record by a bill of exceptions, and cannot, therefore, be considered, and we are unable to see from the record, that · accused did not have the proper panel from which to select a jury on his trial. But we are not prepared to hold, that such a change, if it had occurred, would have been ground of reversal.

The accused, on the trial below, peremptorily challenged a juror, because he was over sixty years of age, but the court refused to allow the challenge, which is assigned for error. It was held in the case of *Davis* v. *The People*, 19

Ill., 74, that this was not a disqualification, but was an exemption or privilege of which the juror could alone avail himself. But was not ground of challenge by either party. We see no reason to change the rule there announced.

It is urged with great earnestness that the court below erred, in receiving the declarations of deceased, without a proper foundation. It is contended, that it does not sufficiently appear that deceased, when he made the statements, was aware of his situation, and had lost all hope of recovery Metzner testifies that he was present at the time, and drew up the caption of the statement made by deceased, and informed him that he would have to swear to it; that he read it over to him. This witness says he heard deceased express no opinion as to whether he believed he would recover or not, but he inquired of witness for his opinion, when he informed him that he believed he would not recover, and Shies died the next day.

Searles testifies that he was present and heard the statements made, and being read to deceased, he swore him to their truth. Metzner states that he took down the substance of the statement, not using the precise language of the deceased. He also states that deceased was under the influence of morphine, and that to some of the questions he nodded assent, and to others he gave answers. At times while the declaration was being made, it became necessary to rouse him before it could proceed. It also appears that he was visited by his spiritual adviser, and partook of the last rites of his church, before the declarations were made, and we think that it appears that he must have lost all hope of recovery, and his declarations were so taken as to authorize them to be read to the jury.

It is, however, true, that from the condition of deceased, when they were taken, they are not entitled to much weight, and they alone could not sustain the verdict. But they in most material points are corroborated by other evidence. In fact there was an abundance of evidence independent of this

to sustain the verdict.   We cannot say that it tended to mislead the jury.   These declarations were before them for their consideration, and they no doubt considered all the circumstances which attended them when made, and gave to them no more weight than they were entitled to receive.   Again, the attending physician gives the statements of deceased made to him, in reference to the occurrence, and it in the main corresponds with the written statement, although more favorable to the accused.   And when the whole testimony is considered outside and independent of these declarations, there was, we think, an abundance of evidence to warrant the conclusion at which the jury arrived.   It was proved beyond all reasonable doubt that the accused inflicted the mortal wound, and this being established, the law implies the malice, and it devolved upon him to show the justification or mitigation, to reduce it from murder, or to obtain an acquittal, unless the whole circumstances show that it was not accompanied by malice.

Some confusion seems to exist in the evidence as to some circumstances connected with the transaction.   After the fight occurred in the street, as to how or why it took place, there seems to be no evidence, plaintiff in error went into his house and procured his gun, and returned with it—some of the witnesses say into the street, and others that he remained inside of his enclosure.   This shows that he did not decline the fight, as he at least advanced from the inside of his house to his gate, if not into the street, apparently seeking the contest.   There is no evidence that he advanced for any other purpose, nor does it appear that deceased was endeavoring to enter his premises, or to inflict injury on him or his property.   It is true that he warned deceased not to advance or he would shoot.   There is no evidence that deceased was armed, or was advancing in a menacing manner, but on the contrary he was assuring accused that he intended no harm, but wished to explain and be friendly.

The deceased seems to have attempted to turn the muzzle of the gun to one side, and in doing so, appeared to be

afraid that accused would shoot.  He probably feared to re-
treat, and saw no other means of escape.  We are unable to
see anything in the evidence, from which it appears that the
life of accused was in danger, or that he was likely to receive
a grievous bodily injury, and nothing to excite apparently a
well-grounded fear of such results.  When considered alto-
gether, we think the evidence could not fail to convince the
jury that there was a want of justification in the killing, and
this, too, whether the declarations were received or were
rejected.

It is likewise insisted that the court erred in giving instruc-
tions asked by the prosecution, and in refusing a portion of
those asked by the accused.  After a careful examination of
the instructions given for the people, we find them correct,
or made so by those given for the defence.  As a general
rule, instructions depend upon themselves, but they, when
taken together, may, and frequently do, by explaining others,
become freed from objections.  In the twelve given for the
defendant, the law of the case seems to be clearly announced,
so far as it was applicable to the facts of the case.  And
those given for the defence, with one or two exceptions, an-
nounce the principles contained in those that were refused.
When a legal principle has been once announced, there can
be no necessity for its repetition, and there can be no error
in refusing to give it in a second instruction.

The refusal to give the first, second, eighth and ninth of
the instructions asked by defendant below, is principally
complained of as error.  They, in a variety of ways, state
that if there was a struggle between the accused and the
deceased for possession of the gun, and it was discharged in
consequence of the struggle, they should acquit.  We are
unable to perceive any evidence, or anything tending to prove
a struggle for possession of the gun.  There was a contra-
riety of evidence whether deceased had hold of the gun
when it was discharged.  But even if there was such evi-
dence, it may have been that deceased saw that the only
means he had to prevent accused from shooting him was to

wrest it from the accused. In such a case, it cannot be said that a man doing all within his power to take the life of another is justified in doing so because the person assailed endeavors simply to dispossess the assailant of the weapon as a means of preserving his own life, although it may have contributed unintentionally to the discharge of the gun. Such a rule would deny to the person assailed the means of self-defence, and warrant the aggressor in perpetrating his purpose, simply because the other endeavored, as the only means presenting itself to save his life, to take from him the deadly weapon.

In the remaining five instructions asked, and refused, we perceive no error. So far as they contain correct principles, they had already been given, and there was no reason for their repetition. From the entire record in the case, it appears that the accused has had a fair trial, and that no error has intervened in his conviction. The judgment of the court below must, therefore, be affirmed.

*Judgment affirmed.*