DETERMINED IN

# THE SUPREME COURT

OF THE

# STATE OF CALIFORNIA.

[No. 20390. In Bank. — June 22, 1888.]

## THE PEOPLE, RESPONDENT, v. WRIGHT J. FARMER, APPELLANT.

CRIMINAL LAW — HOMICIDE — EVIDENCE — DYING DECLARATIONS. — The condition of the declarant's mind as to his apprehension of death, at the time of making a dying declaration, must be determined from all that was said and done, and not from a critical consideration of a word once employed in the conversation. If it sufficiently appears from the evidence that when the statement was made the deceased believed that he was about to die, the words appended to the statement by the scribe who reduced it to writing, "In view of the probability of my dying, I make the above statement as my dying declaration," will not render the statement inadmissible.

ID. — DECLARATION AS TO REASON FOR HOMICIDE — OBJECTION TO EVIDENCE. — A dying declaration that the defendant had no reason whatever for the homicide may be fairly referred solely to the time of the homicide, and may be construed to mean that deceased had attempted no violence towards the defendant; but if construed as relating to past transactions, or as a mere expression of opinion, a specific objection to such portion of the declaration must be called to the attention of the court below by a motion to strike out, or by some other appropriate method, or the objection will not be considered on appeal.

APPEAL from a judgment of the Superior Court of Lake County.

The facts are stated in the opinion of the court.

LXXVII. CAL.—1

*F. E. Johnson,* and *R. C. Home,* for Appellant.

*Attorney-General Johnson,* for Respondent.

McFARLAND, J.—The defendant was convicted of murder in the second degree, and appeals from the judgment. The only ground relied on for a reversal is error in admitting in evidence the dying declaration of the deceased; the contention being that the declaration was not made under a solemn sense of impending dissolution. Two witnesses, W. C. Goldsmith and William Newman, testified as to the condition of the deceased. Goldsmith testified that he knew the deceased, Thomas G. Christie, in his lifetime; that he was shot, according to his information, a little after midnight; that witness saw him shortly afterwards; and that the statement offered in evidence as a dying declaration was made at 1:35 o'clock, A. M., of the same night. His subsequent testimony was as follows. Question: "Do you know, and if so, how do you know, whether Mr. Christie, at the time he made that statement, had any belief upon the subject whether he would die from the effect of that wound? Answer: He told me that he was killed; that he would die. I went in to see him, and I said: 'Are you hurt, Tommy, bad?' 'Oh!' said he, 'Mr. Goldsmith, I am killed.' I said: 'I guess not. Where are you hurt?' He put his hand to his side and showed me."

After some matters not material here, the testimony proceeds as follows: " A. He said he believed it would kill him. He said: 'It's no use; I can't get well.' When I first came in from supper, he told me that. There was no anticipation of taking this statement at that time. It was more than an hour before he gave the statement. Q. Then what did he say about that afterwards, just before the statement was made? A. He said he didn't believe he would get well. Q. He believed he would die? A. Yes, sir. Q. And he made a statement? A. Yes, sir; he made a statement, and said it was his dying statement.

He was in his right mind, he declared himself. I asked him, and he said he knew me and all the parties around there. He was in his right mind. I talked with him about other matters, and my opinion is that he was in his right mind. Question by the court: You think he saw things clearly, and was able to give it correctly? A. Yes, sir, he said he was in too much pain to give a statement, but he would give answers to questions, and what questions were asked him, he answered them." After some discussion between the court and counsel, the testimony proceeds as follows: "Q. Now, what was it the dying man said, Mr. Witness? A. He said he could not get well. Q. What else did he say? A. He said—I came out and spoke to him, and I said: 'How are you hurt, Tommy?' Question by the court: What time was that? A. It was after twelve o'clock, I think. He said he was shot. I said, 'Where?' He said, 'Here.' I said, 'Who done it?' He said, 'Farmer.' I said, 'Are you hurt bad?' He said, 'I am killed; I never can get well.' He said, 'I will die.' I said, 'Where are you hit?' He pulled his shirt down and showed me where he was shot. Question by the court: How long was that before you took the statement? A. It was over an hour. Question by the court: Now, I wish you would detail everything that Mr. Christie said at the time he was going to make that dying statement? A. I asked the doctors— Q. They were present? A. Yes, sir."

Here follows a description of the attempt of the doctors to probe the wound. The witness then proceeds as follows: "Then I says, 'Doctor, do you think there is any chance for him?' 'No,' he said, 'there is no possible show, he is sinking very fast.' Q. That was in the presence of the deceased? A. Yes, sir. Q. He could hear it? A. Yes, if he was listening. It was about five feet from him, in the same room at the far end of the table that was setting there. So I went out in the other room, and staid there a few minutes, and came back, and asked

him how he was feeling,—if he did not want to send for some of his folks. He said, 'Yes'; for William and his mother. I believe he told me to send for his mother, and some boy sitting around there volunteered to go, and he said he would go after his brother, and he went, and during that time he was gone I saw him all the time. [The mother lived and was at Lakeport, a distance of thirty-two miles from where the deceased was at that time.] He complained that he was getting worse; that he did not think that he could live, and wondered how long it would be until William came. [William, the brother, only lived a short distance—a few miles—from where the deceased then was.] I told him to keep up good courage; that was half the battle. I said, 'You may pull through.' He said 'No; I can't.' He expressed the opinion,—'No, I can't get well,' he said. I went in the room, and the doctor said, 'Ain't you a justice of the peace?' I said, 'Yes.' They said, 'I think you had better go and have him make an ante-mortem statement, for he can't live much longer, and he is sinking very rapidly.' Several persons were sitting there,— George Minstrell and others,—and they said, 'Let's go right along.' We went in, and I told him the doctors said he could not live; that it was almost certain that he would die. Question by the court: You told Christie that ? A. 'Yes, sir'; that it was necessary to make a statement now if he wished to make any. He said that he could not; that he could not talk enough; it hurt him too bad to talk. I asked him if he could answer questions. He said, 'Yes.' I said, 'You know who I am ?' 'O, yes,' he said, 'I know who you are, and I know everybody, and I know everything.' I said, 'You can answer questions?' He said, 'Yes.' So George W. Minstrell took a pencil, and I asked him the questions that are propounded in that instrument, just as they are there. That is the way it was done, and how it came to be done. He said, 'I am shot, and I never can get well.' It appeared to me

that he thought he was almost in dissolution. It impressed me that he thought he would die right then when he said, 'I never can get well.' He died the next day. I took my watch out, and it was 1:35 o'clock, A. M., when he made this statement, and I so had it written on the statement. I don't know exactly when he was brought in there [the place where he was when the statement was made]. I went to supper; and when I came back it was ten or fifteen minutes to twelve o'clock, midnight. He was brought in there while I was gone to supper. The court to the district attorney: If you have other testimony upon the point, I would like to hear it. Thereupon the prosecution called one William Newman, who, being first duly sworn, testified: Question by Mr. Crump: Were you present about the time Christie made that dying statement? A. I was present at the time,—most of the time,—and up to the time of his death. Q. About the time, or just before the time, of that dying declaration, state, if anything, what you heard Tom say about his belief that he would die. A. As soon as I saw him, immediately after he was shot,—not more than two or three minutes after they took him out of the court,—he said, 'Billy, I am killed; for God's sake send for mother.' We carried him inside, and he said, 'Send for Billy, too'; and we got Frank Adams to go for Billy, and his mother was sent for. Every few minutes he would say, 'Send for mother, for God's sake; I am going to die.' He spoke several times about his dying. That is the only way he talked. He did not talk as if he had any hope of recovery. I was with him when he made the statement. He said to send for his mother; that he wanted to see her before he died. Question by the court: He said he knew he was bound to die? A. Yes, sir."

This was all the evidence upon the point. It would serve no good purpose to restate here the rules which govern the admissibility of dying declarations. They

are well established and generally understood, and the difficulty always is in applying them to particular cases. It is sufficient to say in the case at bar, that, in our opinion, the circumstances in proof warranted the court in admitting the declaration. And we do not think, as argued by counsel for appellant, that the correctness of the ruling is impeached by the fact that the scribe who reduced the statement to writing concluded it with these words: "In view of the probability of my dying, I make the above statement as my dying declaration." The deceased was in too much pain to make a statement in a narrative form. It was taken by question and answer. It is quite as likely that the word "probability" was suggested by the person who wrote it as that it originated with the deceased. At all events, the condition of the declarant's mind as to his apprehension of death must be determined from all that was said and done, and all the circumstances surrounding him, and not from a critical consideration of the exact meaning of a word used only once during all the conversations. And, taking all the evidence into consideration, we think that it sufficiently appears that when the statement was made the deceased believed that he was about to die.

Counsel contends here for the first time that the statement was erroneously admitted, because it contains the following: "Question: What did he shoot you for? Answer: He had no reason whatever." This contention, of course, rests upon the rule that a dying declaration is admissible only as evidence of the circumstances under which the mortal injury was received,—the facts of the *res gestæ,*—and not as evidence of former and distinct transactions, or when it is mere expression of an opinion. It is doubtful if this contention could be sustained, even if the point had been properly presented. A fair construction of the matter complained of is, that it referred solely to the time of the homicide and the circumstances immediately surrounding it, and merely meant that at

that time deceased had attempted no violence towards defendant. "Where, in making a dying declaration, the declarant, in speaking of the fatal wound, said it was done without any provocation on his part, it has been held that this declaration is not incompetent; it relating to fact, not opinion." (Wharton's Crim. Ev., sec. 294, and cases there cited.) But, in any view, this specific objection to a part of the declaration should have been called to the attention of the court below by a motion to strike out, or by some other appropriate method.

The judgment is affirmed.

SEARLS, C. J., McKINSTRY, J., PATERSON, J., SHARP-STEIN, J., and THORNTON, J., concurred.