## B. H. UPDIKE v. STATE.

No. A-1356.   Opinion Filed April 5, 1913.

(130 Pac. 1107.)

1. **HOMICIDE—Dying Declarations—Admissibility.** (a) Where a dying declaration has been reduced to writing, and has been read over to and approved and signed by the deceased, the fact that it may not be in the exact language used by the deceased will not render it inadmissible; provided, the language used is substantially the same as that used by the deceased.

(b) For a written statement which was properly admitted in evidence as a dying declaration, see opinion.

2. **HOMICIDE—Instructions—Degree of Offense.** Where an appellant has been convicted of murder, the judgment should not be reversed because of the failure of the trial court to instruct on manslaughter in the second degree, when it appears from the testimony that the issue of manslaughter in the second degree was not raised by the evidence.

3. **HOMICIDE—Instructions—Construction as a Whole—Manslaughter —Anger or Voluntary Intoxication.** (a) Instructions must be considered as a whole and all of their several parts must be construed together and in connection with each other.

(b) For correct instructions upon the subject of manslaughter in the first degree given in a case where the appellant was convicted of murder, see opinion.

(c) Anger or voluntary intoxication when not of such a character as to render the mind incapable of forming a premeditated design to effect the death of the deceased or of some other person will not reduce an unlawful homicide from murder to manslaughter.

(Syllabus by the Court.)

*Appeal from District Court, Oklahoma County; George W. Clark, Judge.*

B. H. Updike was convicted of murder, and his punishment assessed at imprisonment in the penitentiary for life, and he appeals. Affirmed.

*Moman Pruiett* and *Kistler, McAdams & Haskell,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, J. Three questions are presented in the brief of counsel for appellant: First, that the court erred in receiving as dying declarations a written statement purporting to have been made by the deceased; second, that the court erred in instructing the jury that they could not convict the appellant of manslaughter in the second degree; third, that the court erred in the instructions given to the jury with reference to manslaughter in the first degree.

First. When the purported dying statement was offered in evidence, counsel for appellant objected to the same as being incompetent, irrelevant, and immaterial, and not being a statement made by the deceased. This objection was overruled by the court, to which appellant excepted. The record then proceeds as follows:

"Whereupon, the statement was read to the jury, which is in words and figures as follows, to wit: 'I, P. D. Anderson, of Oklahoma City, Oklahoma, being mortally wounded, and realizing and believing that I will not live, and having given up all hope of life and recovery, make the following statement as my dying declaration: I live at 111½—'

"By Mr. Pruiett: I now object, and ask that that portion of the statement 'make this my dying declaration, be stricken, for the reason that it is not the language of the deceased,

wholly incompetent, irrelevant, and immaterial and prejudicial to the rights of the defendant.

"By the Court: Overruled.

"By Mr. Pruiett: Note our exception.

"(Statement continued:) 'West Reno, in Oklahoma City, Oklahoma. My wife lives at 1111 West Reno. Updike's wife is my wife's sister. We are brothers-in-law. Updike was on a big drunk. I just walked down there for a few minutes. Updike and his wife were having a quarrel. He shot the other man, and then he shot me. The other man rooms there with him. Updike and his wife had some trouble. He said, "Nolie, I am going to kill you." He went to another room, and came back with a gun, and kicked a window out to get into the room. His wife left when he kicked the window in. He then shot the other man who was there, and then before I could get out he shot me. Jan. 15, 1911. [Signed] P. D. Anderson.'"

In support of this objection, counsel for appellant in their brief say:

"The evidence of Mr. Zwick and Dr. Riley clearly shows that the following part of the statement was not the statement of the deceased, but that of Mr. Zwick, assistant county attorney; 'I, P. D. Anderson, of Oklahoma City, Oklahoma, being mortally wounded, and realizing and believing that I will not live, and having given up all hope of life and recovery, make the following statement as my dying declaration.' The evidence clearly shows that Mr. Anderson never made any such statement, and we do not believe that it can be inferred from his action that he even acquiesced in the same."

So it is seen that the specific objection to the dying declaration was that the statement contained in the first paragraph was not in the language of the deceased, and that there was nothing in the record showing that he acquiesced in the language used. The paragraph objected to did not state any fact affecting the guilt or innocence of appellant. It was merely introductory to the statement as to how the homicide occurred. It is nowhere claimed in the brief of counsel for appellant that as a matter of fact it had not been proven that the statement made by the deceased was not made under such circumstances as would render it competent as a dying declaration and no

such objection was made in the court below. The objection then can only be considered as to the first paragraph contained in the statement. This matter was fully investigated in the trial court. William H. Zwick, assistant county attorney, testified: That he called on the deceased at the hospital about 7:30 o'clock on the evening of the difficulty, and was with him about 20 minutes. Dr. Riley was present. That he informed the deceased that he represented the county attorney's office, and asked the deceased if he desired to make a statement as to how the shooting occurred. The deceased asked the doctor as to his condition, and asked him if he would ever recover. The doctor said: "In my judgment you will die from the effects of this wound." That witness then informed the deceased that unless he felt himself that he was going to die from the effects of the wound, and believed what the doctor had told him, he, witness, did not desire to take a statement from him, deceased, because it would be of no value. Deceased then said: "I will tell you how it occurred." That witness took out a piece of paper and wrote down what deceased said to him; when he was through, witness said to deceased, "Can you understand me?" and deceased said that he could. Witness then said, "I want to read the statement to you slowly and carefully and if it is not correct I want you to make the correction." That witness then read the statement over in full, and asked deceased if it was correct, and he replied that it was. That then two attendants raised deceased up in the bed and witness held a paper before him and the deceased signed it.

Mrs. Graham testified that she was with deceased shortly after the shooting; she saw the deceased on the back porch of the apartment where he was shot; that she knelt down by him and he was gasping to get his breath, and she saw that he was still alive; that finally he appeared to regain consciousness; that he never mentioned his wife and child while he lay there, except to give their address, and he made no statements there except to answer questions.

Dr. J. W. Riley testified: That he was commissioner of health of Oklahoma City. That about 6 o'clock on the evening of the 15th day of January, 1911, he was called upon to visit deceased. That deceased was shot through the body, but the bullet did not come out. The deceased was carried to St. Anthony's Hospital about 7 o'clock, and witness saw deceased there, and was with him an hour or an hour and a half. When he next saw the deceased, the deceased was dead. The deceased died about midnight that night from hemorrhage from the wound inflicted. That, when he first saw the deceased, he was semiconscious. He was just coming out of the shock from the shot, but the deceased regained his conscionsness completely. Witness was acquainted with William H. Zwick, the assistant county attorney, and was present when he was in the room of deceased. That deceased was conscious, and talked and answered questions intelligently, and seemed to understand what he said and what was said to him. That witness informed deceased that he was mortally wounded, and was going to die, and informed deceased he could not do anything for him, and that, if he had anything to say, he had better say it. Mr. Zwick spoke up and told the deceased that, unless he realized he was mortally wounded and was going to die, the statement would do no good. The deceased then made a statement to Zwick and it was taken down and reduced to writing by Zwick. It was then read over to the deceased and signed by him; when it was so read over, deceased said "that was the facts in the case," or words to that effect. There was no possibility of the recovery of the deceased at the time the statement was made. Deceased appeared to realize the seriousness of his condition, and appeared to realize that he was going to die and called for his wife and child.

The circumstances under which this statement was made and the statements which passed between assistant county attorney Zwick and the deceased fully justified the statements contained in the paragraph objected to, and the fact that they

were afterwards read over to and signed by the deceased, makes them the statements of the deceased. It is absolutely clear that these statements were made when all hope of recovery had been lost, and when the deceased was really a dying man. When first shot, deceased fell to the floor in an unconscious condition caused by the shock of the wound. Those who first reached him found him gasping for breath, and testified that he afterwards regained consciousness. The character of the wound and all of the circumstances in this case are conclusive as to the fact that deceased realized his condition.

In the case of *State v. Baldwin,* 15 Wash. 15, 45 Pac. 650, the very question now before us was passed upon by the Supreme Court of Washington, and that court said:

"He had been informed by the doctor that he was about to die, and said that he realized it. This was sufficient to make the declaration admissible. It also appeared that the deceased had sent for an attorney, and had related to him the circumstances of the shooting, and that some time thereafter said attorney reduced the same to writing, not in the presence of the deceased; and it also appears that in one. or two minutes said attorney testified the statement was incorrect, and that he had made a mistake therein in reducing it to writing, but it appears that the statement had been read to the deceased a short time before his death, and that, after directing a portion of it to be re-read to him, he seemed satisfied with it, and signed it. The fact that it was not in the exact language of the declarant would not render it inadmissible. Nor would the testimony of the attorney who reduced it to writing that it was incorrect in one or two particulars, as it would still be a question of fact for the jury. The alleged mistake related to an unimportant matter leading up to the time of the controversy, and it probably escaped the attention of the declarant at the time the same was read over to him. None of the objections raised against the admission of the dying declaration are tenable."

In the case of *State v. Cantieny,* 34 Minn. 1, 24 N. W. 458, discussing this very question, the Supreme Court of that state said:

"The declaration thus presented was in a writing which was made by one Carrigan, in the presence of Laughlin and of

one Kennedy. The facts of the case were drawn out from Laughlin by Carrigan, who then put the same in the writing. Some facts were suggested by Kennedy, to which Laughlin assented. The writing was then read to Laughlin, who assented to its correctness by a signature, and by responding, 'Yes,' in answer to a question as to whether he swore to it. The manner in which the instrument was made was not such as to render it inadmissible as the declaration of the deceased. Wharton, Crim. Ev. sec. 300; *Com. v. Casey, supra* [11 Cush. (Mass.) 417, 59 Am. Dec. 150]; *Murphy v. People, supra* [37 Ill. 447]; *People v. Sanchez, supra* [24 Cal. 17]."

Although a statement reduced to writing is not in the exact language used by the deceased, yet, if it clearly appears from all of the testimony in the case that the statement was made under circumstances rendering it admissible as a dying declaration and it was read over to and approved and signed by the deceased, it will be admissible in evidence. On this question in the case of *State v. Kindle,* 47 Ohio, 358, 24 N. E. 485, the Supreme Court of that state said:

"We are of opinion that in cases of homicide a statement of the injured person made *in extremis,* while conscious of his condition, and under a sense of impending dissolution, reduced to writing by a competent person, at the instance of the declarant, or with his consent, approved and signed by him, containing statements of the circumstances of the unlawful act which results in death, after proper preliminary proof has been introduced, is admissible in evidence."

In the case of *People v. Farmer,* 77 Cal. 1, 18 Pac. 800, the Supreme Court of that state said:

"It would serve no good purpose to restate here the rules which govern the admissibility of dying declarations. They are well established and generally understood, and the difficulty always is in applying them to particular cases. It is sufficient to say in the case at bar that in our opinion the circumstances in proof warranted the court in admitting the declaration. And we do not think, as argued by counsel for appellant, that the correctness of the ruling is impeached by the fact that the scribe who reduced the statement to writing concluded it with these words: 'In view of the probability of my dying, I make the above statement as my dying declaration.' The deceased was in

too much pain to make a statement in a narrative form. It was taken by question and answer. It is quite as likely that the word 'probability' was suggested by the person who wrote it as that it originated with the deceased. At all events, the condition of the declarant's mind as to his apprehension of death must be determined from all that was said and done, and all the circumstances surrounding him, and not from a critical consideration of the exact meaning of a word used only once during all the conversations. And, taking all the evidence into consideration, we think that it sufficiently appears that, when the statement was made, the deceased believed that he was about to die."

See, also, *Addington v. State,* 8 Okla. Cr. 703, 130 Pac. 311; *Ryan v. State,* 8 Okla. Cr. 625, 129 Pac. 685; *Morris v. State,* 6 Okla. Cr. 29, 115 Pac. 1030; *Offitt v. State,* 5 Okla. Cr. 48, 113 Pac. 554; *Mulkey v. State,* 5 Okla. Cr. 75, 113 Pac. 532; *Blair v. State,* 4 Okla. Cr. 360, 111 Pac. 1003; *Nelson v. State,* 3 Okla. Cr. 468, 106 Pac. 647; *Hawkins v. United States,* 3 Okla. Cr. 651, 108 Pac. 561; *Bilton v. Territory,* 1 Okla. Cr. 566, 99 Pac. 163.

Second. Upon the trial of this cause, among other things, the court instructed the jury as follows:

"The information charges the highest degree of homicide or that of murder, but the charge therein embraces all the lower degrees of homicide, but there is, in this case, no element of manslaughter in the second degree, nor of excusable homicide as the latter is defined by our statute."

To this instruction appellant reserved an exception. Section 6857, Comp. Laws 1909, is as follows:

"In charging the jury, the court must state to them all matters of law which it thinks necessary for their information in giving their verdict, and if it state the testimony of the case, it must in addition inform the jury that they are the exclusive judges of all questions of fact. Either party may present to the court any written charge, and request that it be given. If the court thinks it correct and pertinent, it must be given, if not, it must be refused. Upon each charge presented and given or refused the court must indorse or sign its decision. If part of any written charge be given and part refused the court must distinguish, showing by the indorsement or answer what part of each charge was given and what part refused."

This makes it the duty of the trial court to give to the jury such instructions as the court may think necessary for their information in giving their verdict. This vests the matter of the instructions to be given in the discretion of the trial court. It is true that this discretion is subject to review upon appeal, but it will not be disturbed unless the record presents a clear case of abuse of discretion. No conviction should be reversed for the failure of the trial court to instruct upon any given issue, unless from the testimony in the case it appears that an honest and intelligent jury could legitimately arrive at a conclusion favorable to the defendant upon such issue. We fail to find any evidence in this record upon which an intelligent and honest jury could have convicted appellant of manslaughter in the second degree. The action of the trial court in giving the instruction complained of is therefore not error.

Third. Upon the trial of this cause, the court, among other things, instructed the jury as follows:

"Before the defendant could be found guilty of manslaughter in the first degree, you must believe from the evidence, beyond a reasonable doubt, that the homicide charged in the information was perpetrated by him by means of a dangerous weapon, in a heat of passion, but without a design to effect death, and that the same was not committed in self-defense, or under such circumstances as constitutes justifiable homicide, as defined in these instructions."

To this instruction appellant excepted at the time. In support of the exception taken to this instruction, counsel for appellant in their brief say:

"The court will note from this instruction that the trial court said to the jury that, before they would be warranted in finding the defendant guilty of manslaughter, they must find beyond a reasonable doubt that the homicide was perpetrated by him by means of a dangerous weapon in a heat of passion, which clearly placed the burden upon him to show that he committed the homicide in a sudden heat of passion, before the jury would be warranted in reducing the offense from murder to manslaughter, and, having previously eliminated from the consideration of the jury second-degree manslaughter, excusa-

ble homicide, and by inference justifiable homicide, this instruction certainly placed the burden upon the plaintiff in error to show that the homicide was committed without a design to effect death, and further that the same was not committed in self-defense, or under such circumstances as constitute justifiable homicide, as defined in these instructions, and that all these things had to be found by the jury beyond a reasonable doubt before he could be found guilty of manslaughter. Had it not been for this instruction, we believe under the evidence in this case that the jury would not have returned a verdict of murder in the first degree."

The position of counsel for appellant is that this instruction required the jury to convict appellant of murder unless the jury should find from the evidence beyond a reasonable doubt that appellant committed the homicide by means of a dangerous weapon and in a heat of passion, and without a design to effect death, and not in self-defense, or under such circumstances as constituted justifiable homicide as defined in the instructions. In assuming this position, counsel for appellant have not considered this instruction in connection with the other instructions given. The absurd consequences which would result from this line of reasoning can be well illustrated by quoting three passages of Scripture without reference to the connection in which they are used. In one place the Bible says: "Judas Iscariot went out and hanged himself." In anotser place the Bible says: "Go thou and do likewise." In another place the Bible says: "And all the people said Amen." By selecting isolated passages without reference to the context and subject-matter, counsel could easily dispose of the entire instructions given by the court. Instructions must be considered as a whole. All of their several parts must be considered in connection with each other. The court had previously instructed the jury that, before appellant could be convicted of murder, they must find from the evidence beyond a reasonable doubt that he killed the deceased with a premeditated design to effect his death, and that such killing was not justifiable under the other instructions given, and that, if they entertained

a reasonable doubt upon this subject from all the evidence in the case, they should find the defendant not guilty of murder. The court also instructed the jury as follows:

"If, from the evidence, facts, and circumstances in the case as disclosed upon the trial, you entertain a reasonable doubt of the guilt of the accused, it is your duty to give the defendant the benefit of that doubt and acquit him. If you believe from the evidence beyond a reasonable doubt that the defendant is guilty of either murder or manslaughter in the first degree, it is your duty to determine the particular crime of which he is guilty, and if you have a reasonable doubt whether the offense, if any, is murder, then it will be your duty to give the defendant the benefit of that doubt, and acquit him of that crime."

The court again instructed the jury as follows:

"If you do not find the defendant guilty of murder, you will next consider whether he is guilty of manslaughter in the first degree as defined in these instructions, and if you find, from the evidence, facts and circumstances, as disclosed upon the trial, beyond a reasonable doubt, that the defendant killed the said Anderson in a heat of passion by means of a dangerous weapon and without a design to effect his death, and you do not entertain a reasonable doubt from the evidence as to whether he was justified in taking the life of the deceased, you will find the defendant guilty of manslaughter in the first degree as charged in the information. If, however, you do not find the defendant guilty of murder, and you entertain a reasonable doubt as to his having killed the said Anderson in a heat of passion and by means of a dangerous weapon, without a design to effect his death, you will return a verdict of not guilty."

Considering all of these instructions together, we think that they properly present the law of the case. Even if there was error in the instruction upon the subject of manslaughter, we do not think that appellant could be heard to complain thereat. Section 2271, Comp. Laws 1909 (Rev. Laws, 2316), is as follows:

"Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time."

The most that could be said is that appellant was angry, and was more or less intoxicated when he fired the fatal shot. His own evidence makes it clear that he fired this shot with a premeditated design to effect the death of the deceased. His act was therefore murder, notwithstanding his anger and intoxication. Anger or voluntary intoxication when not of such a character as to render the mind incapable of forming a premeditated design to effect the death of the deceased or of some other human being will not reduce an unlawful killing from murder to manslaughter. This is the plain letter of our statute. Under this statute and the testimony in this case, the trial judge would have been entirely justifiable in not submitting the issue of manslaughter to the jury.

We find no error in the record. The judgment of the lower court is in all things affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.