## FRANK HAWKINS v. STATE.

No. A-1886.   Opinion Filed September 12, 1914.

(142 Pac. 1093.)

1.   **HOMICIDE—Dying Declaration—Admissibility.**   Proof that decedent died within twelve hours after he was shot, that his wounds were necessarily fatal, and that he stated to persons after he was shot that he was dying, and that he expressed no hope of recovery, sufficiently shows that decedent was conscious of impending death, and is in itself a sufficient predicate for the admission of his statements of the circumstances of the homicide as "dying declarations."

2.   **APPEAL—Discretionary Ruling—Denial of New Trial.**   Motions for new trial upon the ground of newly discovered evidence, made before or after judgment, are addressed to the discretion of the trial court, and its ruling thereon will not be disturbed, except for an abuse of discretion.

3.   **HOMICIDE—Murder—Sufficiency of Evidence.**   See statement of facts for evidence held sufficient to support a capital conviction for murder.

(Syllabus by the Court.)

*Appeal from District Court, Creek County;*
*Wade S. Stanfield, Judge.*

Frank Hawkins was convicted of murder, and appeals. Affirmed.

The plaintiff in error, Frank Hawkins, and one Lewis Price were jointly informed against for the murder of Will Crockett, in Creek county, on or about the 6th day of April, 1912. A severance was granted, and the state elected to try the defendant Hawkins first. He was convicted, and his punishment assessed at death. On the 29th day of October, 1912, in accordance with the verdict, the court rendered judgment, and he was sentenced to be hanged. To reverse the judgment, an appeal was perfected.

The evidence discloses substantially the following facts: The defendant Hawkins, and his codefendant, Price, were negroes, and long-time residents of Creek county, and until some

time in March, 1912, lived near Spring Creek, some ten or twelve miles northwest of Bristow. Crockett, the deceased, had also been living near Spring Creek, and had been picking cotton and doing other work for the defendant Hawkins. At that time, the defendant moved to his brother Ben Hawkins' place, near Bristow. The defendant Hawkins was a widower, and Crockett's wife and daughter went with him when he moved. On April 6, 1912, the day of the homicide, in the forenoon, both the defendants, Hawkins and Price, and Crockett, the deceased, were at Ben Hawkins' house, and some trouble arose between the defendants and Crockett over his wife. During the difficulty either the defendant Hawkins or Price knocked Crockett down with a pistol, and chased him around the house a time or two. He agreed to leave if they would not kill him, and started away in the direction of Bristow. The defendants compelled him to go in another direction, southwesterly from the house, and then followed along behind him. The path followed by Crockett at the direction of the defendants wound around along and across a canyon and through the timber. At last they came to a lonely spot about three miles southwest of the town of Bristow and about one-fourth of a mile from the public highway. Price went around in front of Crockett and nodded his head to Hawkins, who was standing behind. Crockett turned to see what the trouble was, and as he turned Hawkins shot him with a pistol, the ball entering his left jaw, ranged upward, and lodged close to the right eye. Crockett fell, and Hawkins and Price dragged him to a gulch and threw him over a ten-foot bank into a stream of water, about two feet deep. His head, instead of falling into the water, lodged on the side of the bank. After throwing him there, one of them again shot him, this time in the back. They then left him, as they supposed dead, and returned to the home of Ben Hawkins, otherwise known as Ben Broadenaxe, taking a secluded route, but different from the one taken in going. This was between 10 and 11 a. m. In about an hour, Crockett revived and had strength to drag himself a distance of 200 or 300 yards,

where his calls for help were heard by a white man named Charles Flint, who lived a little over a quarter of a mile from the scene of the shooting. It was about 1 p. m. when Flint found Crockett in a dying condition, and took him to his house. He stated that he was about to die, and asked Flint to take a book out that was in his pocket and write his name, and that of Frank Hawkins and Lewis Price. Flint's wife had called Mr. Decker, a neighbor. Crockett then said they had shot him and had thrown him in the ditch. Flint then went to Bristow and notified the officers and returned with a Mr. Ellis and Purdy, and they took Crockett to Bristow, where he died that evening between 9 and 10 o'clock. About two hours before he died, and after the doctors had examined and cared for him, he said he would like to make a statement, as he thought he was dying. Several persons were present at the time, and Ralph Ellis, in the presence of W. N. Ellis, and W. W. Lee, James Roberts, and others, wrote the statement, which, over the defendant's objection, was admitted in evidence. It reads as follows:

"About 9 o'clock this morning I was at Ben Broadenaxe's house. Lewis Price claimed that I had threatened to kill him, but I never did threaten to kill him or any one else, and he knocked me down with the pistol, and Frank Hawkins taken the pistol and drawed it on me and told me to get off the place. I told him, 'All right,' and started off. They both said for me to go toward Depew, across the pasture. I acted like I didn't want to go that way, and Frank threw the pistol down on me and made me go. I told them I didn't want to go that way, because I thought they wanted to do something to me, and they said they wasn't, but they did make me go across the pasture with the pistol, about one mile and a half, then Lewis Price stepped in front of me with his hand on his hip pocket and nodded his head to Frank Hawkins, and as I turned to look at Frank, Frank shot me in the jaw and I fell. And they both grabbed me by the legs and drug me to and threw me in a ditch. There was about enough water in the ditch to cover me up and after I was in the ditch, one of them shot me in the shoulder. At that time they went away. I lay there, as best I know, about one hour, then crawled out and hallooed for help, and a white man came and taken me to his house."

Along in the middle of the afternoon Hawkins and Price were arrested and taken by Ralph Ellis to Bristow. The defendant Hawkins, in a conversation with Ellis, admitted the shooting, and also told conflicting stories as to where the pistol was with which the shooting was done. The pistol, however, was found at the home of Ben Hawkins, and had two empty shells in it. After the defendants were taken to Bristow, the defendant Hawkins had a conversation with his brother-in-law, Dave Von, in which he said that he shot Crockett. He had also told Von a few days before the shooting that he intended to kill Crockett. The next morning several witnesses went to Ben Hawkins' house and followed the tracks of three men, leading off therefrom in a southwesterly direction; these tracks were followed to where the shooting occurred, and near where Crockett was shot it looked like a scuffle had occurred, and something had been dragged to the top of the bank.

The defense was an alibi. The defendant Hawkins, as a witness in his own behalf, testified that he was at his brother Ben's that morning, and that Lewis Price and Will Crockett had some trouble there, and then they made up, and then Crockett asked Price to go with him, and they went off down south together; that he then went over to Pete Hamilton's and returned about noon; that he never had any trouble with Crockett, and had never injured him in any way. He denied admitting to Ralph Ellis that he did the shooting, and denied that he had told Dave Von that he intended to kill Crockett. The only witness produced to corroborate him was his brother Ben, who testified that he left that morning and went to a sawmill, and when he returned for dinner the defendant was still at his place. The defendant also produced witnesses to prove the bad reputation of the deceased for truth and veracity. The day after the judgment was rendered the defendant filed a supplemental motion for a new trial, and in support of the same filed the affidavit of his codefendant, who had been in the meantime tried and convicted and his punishment fixed at life imprisonment, which, omitting the formal parts, is as follows:

"Affidavit in Support of Motion for New Trial.

"Lewis Price, being first by me duly sworn, on his oath states: That he was jointly charged by information with the above-named defendant, Frank Hawkins, in the above-entitled cause, with the crime of murdering Will Crockett, and that he was arrested and confined in the county jail. That he told the defendant Frank Hawkins that he killed said Will Crockett, or that, to be specific, he would tell all about the killing of Will Crockett whenever he went to trial. That he never told said Hawkins anything about the particulars of the case until after the trial of the case of the above-named defendant, and that when the arraignment of the above-named defendant and this affiant was made, he demanded a severance in the trial of his case from that of the above-named defendant. That he refused to be a witness in the case of the above-named defendant, and that his case was tried after that of the above-named defendant. That on the trial of his case he testified in his own defense, and told all about the case, and his evidence was in substance as follows, to wit: That on the morning of the 6th of April, 1912, he and said Crockett had some trouble at the home of Ben Hawkins; that Crockett came at him with a stick of wood raised in a threatening manner to strike this affiant; that this affiant knocked said Crockett down, or partly down, with a six-shooter; that thereafter they made up, and Crockett confessed that he, Crockett, was in the wrong; that shortly thereafter said Crockett was preparing to leave, as he said, to go to Mexico, and he and this affiant left the home of Ben Hawkins together and alone; that he was then on his road home, and was going that far on the road that Crockett was going; that he and Crockett went south and west of where Ben Hawkins lived about two and one-half or three miles on the main road that leads to Depew and sat down by the side of the road about 200 yards before coming to a cemetery that was on or near the road; that while there Crockett suddenly jumped up and drew his revolver and attempted to shoot this affiant, but that this affiant caught the revolver with his left hand, and there a life and death struggle took place between affiant and the said Crockett, and in the struggle this affiant drew his own revolver in self-defense and shot Crockett in the back and in the jaw, and then Crockett let loose of the revolver and ran in a westerly direction, and that this affiant never saw him after that time; that affiant then returned to his own home and ate his dinner and started to the town of Bristow and went by and stopped for a while at the home of Ben Hawkins, which was directly on

his road, and was arrested while there; that affiant was going to Bristow to learn if anything had been heard of Crockett, and, if so, how badly he was hurt, and to submit to arrest in case an arrest was considered for the act; that the foregoing statement is true, and said defendant Frank Hawkins was not with affiant and Crockett and knew nothing about it, and that no diligence on the part of the above-named defendant could have learned of the facts. Affiant states that had he thought that a convicviction could possibly have been had against the above-named defendant, he would have told him, and would have been a witness in his defense at whatever might have been the consequences to himself, but that he knew that the above-named defendant was absolutely innocent, and that he could not conceive of a jury convicting him of the crime. This affidavit is made for the purpose of securing a new trial and to be attached to a motion filed or to be filed for that purpose."

*J. L. Byrne* and *S. H. Sornborger,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). The plaintiff in error was convicted of murder, and sentence of death by hanging was duly pronounced.

There are two questions presented on the appeal in this case. The first contention is that the court erred in admitting in evidence dying declarations. That the declarations of Will Crocket, the deceased, were properly admitted there can be no doubt. That he was dying at the time is admitted, and that he was conscious of impending death is undisputed. There is no testimony tending to show that he had any hope of recovery. The admissibility of dying declarations has repeatedly been passed upon by this court. In the case of *Morris v. State,* 6 Okla. Cr. 29, 115 Pac. 1030, it is said:

"It is essential to the admissibility of dying declarations, and is a preliminary fact to be proved by the prosecution, that they were made under a sense of impending death. This may be made to appear from what the injured person said, or where from the nature and extent of his injuries it is evident that he must have known that he could not survive. It is sufficient if it satisfactorily appears that they were made under the sense

of impending death, whether it be directly proven by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical attendants, stated to him, or from other circumstances of the case, such as the length of time elapsing between the making of the declarations and his death, and the fact that the declarant was so weak that he could not sign his name and so affixed his mark, all of which are resorted to, in order to ascertain the state of declarant's mind."

See, also, *Ryan v. State,* 8 Okla. Cr. 623, 129 Pac. 685; *Offit v. State,* 5 Okla. Cr. 49, 113 Pac. 554; *Blair v. State,* 4 Okla. Cr. 364, 111 Pac. 1003.

The second contention is that the evidence is insufficient to support the verdict, and because the evidence of his codefendant, Lewis Price, as a witness in his own behalf, as set forth in his affidavit offered in support of the supplemental motion for a new trial, so affects the proof relied upon by the state as to make it probable that upon another trial a different verdict would be rendered. We think the foregoing statement of the facts which were brought out at the trial is sufficient to demonstrate that there is no merit in this contention.

In *Drew v. State,* 6 Okla. Cr. 348, 118 Pac. 667, it was held that:

"A motion for a new trial upon the ground of newly discovered evidence, made before judgment, or after the term at which the judgment was rendered and sentence pronounced, is addressed to the discretion of the trial court, and its ruling thereon will not be disturbed, except for an abuse of discretion; the presumption being that the discretion was properly exercised."

The whole method and manner of this killing shows that it was a cruel and deliberate murder. It appears from the evidence that the motive that actuated this defendant and his codefendant, Price, to perpetrate the murder was to secure undisturbed possession of the wife and daughter of the deceased. It is manifest from a careful inspection of the whole record that the defendant has had a fair and impartial trial, and, in obedience to the mandates of the law, he ought to suffer the extreme penalty assessed by the jury.

The judgment is therefore affirmed.

It appears from the record that while this appeal was pending the act of March 29, 1913, regulating the infliction of the death penalty, became effective. As the day fixed for the execution of the judgment and sentence has passed, the cause is remanded to the district court of Creek county for the purpose of appointing another day for the execution of the judgment, as provided by sections 5979 and 5980 (Rev. Laws 1910), Procedure Criminal; proceedings to be had in accordance with the rule prescribed by this court in the case of *Alberty v. State,* 10 Okla. Cr. 616, 140 Pac. 1025.

The warden of the penitentiary will surrender the defendant to the sheriff of Creek county, who will hold him in custody pending the proceedings in the trial court, or until his custody is changed by due course of law.

ARMSTRONG, P. J., and FURMAN, J., concur.