## BEN CANTY v. STATE.

No. A-3755.    Opinion Filed Nov. 10, 1921.
(201 Pac. 531.)

(Syllabus.)

1. **Homicide—First Degree Manslaughter—Sufficiency of Evidence.** The evidence upon the trial of an information for murder considered and conviction of manslaughter in the first degree affirmed.

2. **Homicide—Dying Declaration—Admissibility for Court.** It is the province of the court to determine, in the first instance, the admissibility of declarations offered in evidence as dying declarations.

3. **Same—Belief in Impending Death.** Where it is shown that deceased had been advised by the attending physician, and that the advice was such as to induce in his mind a belief that recovery was impossible and death impending, a declaration, made by deceased after he had been so advised, is admissible as a dying declaration.

Appeal from District Court, Love County; Thos. W. Champion, Judge.

Ben Canty was convicted of manslaughter in the first degree, and he appeals.    Affirmed.

Cameron & Walden and Ben F. Williams, for plaintiff in error.

The Attorney General and E. L. Fulton, Asst. Atty. Gen., for the State.

DOYLE, P. J.  Plaintiff in error, Ben Canty, was charged in an information filed in the district court of Love county with murder, for that he had shot and killed Walter Tate, and upon a trial he was convicted of manslaughter in the first degree and his punishment assessed at seven years in the penitentiary. From the judgment rendered upon such conviction he has appealed, but there has been no appearance in his behalf on his appeal.  When the case was called for final submission it was submitted on the record, and we have nothing before us but the petition in error and case-made.

The errors assigned are based  upon exceptions taken to the rulings of the court upon the admission of evidence, and exceptions taken to an instruction given and refusing to give instructions requested.

The facts attending this homicide, briefly stated, are as follows:

On Sunday night, September 17th, the deceased, Walter Tate, a deputy sheriff of Love county, accompanied by Scott Knight, Andy Rambo and Luther Simmons, went to the home of Hugh Allison, near the town of Oswalt for the purpose of arresting the defendant, Ben Canty, on a bench warrant issued on an information filed in the district court of Love county, charging Ben Canty with the crime of obtaining money under

false pretenses. The party arrived at Allison's house about 10 o'clock. The deceased hallooed. Allison came to the door and asked what was wanted. Deceased said, "I am looking for Ben Canty; is he here?" Allison answered, "I do not know; he was here a while ago." The deceased told Allison to light a lamp. When the lamp was lit deceased walked up and said, "Get up, Ben." Immediately two shots were fired. Deceased came out of the house, and said, "He shot me."

Charley Tucker, a witness for the state, testified that—

"I met the defendant, Ben Canty, about three weeks before the shooting near Oswalt, and he said Walter Tate wanted to arrest him, and if he attempted to arrest him he would run if he had a chance, and if he didn't he would fight."

Frank Smith, sheriff of Love county, testified:

"I arrested the defendant Canty, at Ardmore the next day after the shooting, I put him in jail at Marietta, and on November 16th, about the time his case was to be called for trial, he escaped. The next time I saw him was near Pond Creek, Ark. He ran into the cane brake, and I could not find him. About the 5th of April, 1919, I arrested the defendant near the Cimarron river in Creek county."

Dr. Hardy testified:

"Walter Tate was a patient in my sanitarium in Ardmore. He had a gunshot wound in the left side between the tenth and eleventh ribs, about 3½ inches from the median line, and came out 1½ inches from the spinal column, upward 2 inches from its entrance. It was necessarily fatal. He died the third day. About 10 or 12 hours before his death he made a statement; I had advised him that he could not live."

G. W. Whitfield testified:

"I was pastor of the Baptist church at Oswalt. I first saw Walter Tate that night lying on the porch at Grady Poole's house. I was with him from then, on with the execption of one night and a few hours the next day, until about an

hour before he died. He made a statement in the morning of the day he died. Before making this statement he said he was conscious of impending death. I asked him if he was prepared to die; he said he was afraid it was too late. He was thoroughly conscious of his condition when he made the statement.''

Thereupon, against the defendant's objections, the court admitted the statement, and it was read to the jury as follows:

''Ardmore, Okla., Sept. 20, 1917. My name is Walter Tate. I am 34 years of age. I had orders from Frank Smith to get Ben Canty, and I went to Hughey Allison's house, where Ben was, at about 10 o'clock at night on the 17th day of September, 1917, at Hughey Allison's house, where Ben was, at about 10 o'clock get up and light the lamp, that I had come after Ben Canty, and Hughey Allison went to the kitchen door and started to open it, and I told him to come to the front door where I was and let me in, and Hughey Allison said that he could not open it because he could not find any matches, and I said 'Open up that door,' and then he opened the front door, and I asked him if Ben Canty was in there, and he said that he was a few minutes ago, but he didn't know where he was now. I looked in the window as Hughey Allison struck the match, and I saw Ben Canty hunkered down at the foot of the bed, and about that time Hughey Allison opened the door and I walked in the house, and stepped across the pallet and told Ben Canty to come on, and he cut down on me with his gun, and shot me in the belly, and then I shot back at him, and then I run out of the house, and went up to the road, and I called for Hughey Allison to bring me some water, but I did not see him or Ben Canty any more that night. This is the way the shooting occurred. I, Walter Tate, being in my right mind, and being informed by Dr. W. Hardy that I cannot recover from the gunshot, and realizing that I am about to die, make this statement as to how Ben Canty shot me.''

For the defense, Hugh Allison, codefendant, testified:
''I was living on my farm, 18 or 20 miles northwest from Marietta, with my wife and four children. My home was a

two room box house.   I had known Walter Tate about 18 years.   He lived 2½ miles west of me.   About 5 o'clock that evening Ben Canty and his wife came to my house.   They were walking and leading a pony with some clothes and a gun tied on the saddle.   His wife is my niece.   He asked for a job, and I told him I might give him a few days' work picking cotton.   We retired between 8 and 9 o'clock.   I had gone to sleep and I heard some one calling.   I went to the door, and discovered it was Walter, Tate.   He told me to light the lamp and open the door, and I did, and he came in.   He had a sixshooter in his hand, and took about three steps and fired.  Both shots sounded like one gun.   The shots were so close together I could not tell who fired first.''

Mrs. Hugh Allison testified that her husband opened the door and said, ''Come in, Walter,'' and Walter Tate stepped in and said, ''Ben.''   Then both shots were fired.

Mrs. Anna Canty testified:

''I am the wife of Ben Canty.   We left my brother's that afternoon and went through a pasture a part of the way, then down the public road to Hugh Allison's.   When I woke up the first I saw was Walter Tate, who had come in, and when I first saw him he fired at my husband.''

As a witness in his own behalf, Ben Canty testified:

''I am 26 years old.   I have lived in Love county about 20 years; lived in the same neighborhood with Walter Tate.   I bought the gun from my brother, Will, a couple of months before the shooting; I was asleep, and the first thing I remember seeing after I woke up was a man coming through the door with a sixshooter in his hand.   I grabbed my gun and ran around between the bedsteads and sat down.   He said, 'Ben,' and threw down his gun and shot me.   I threw up my gun and fired to protect myself; then I ran out.   He shot me in the right hand.   The next day I was taken to the Marietta jail.   When this case came on for trial I left on account of my lawyer quitting me.   I thought I had better get away and save up some money so I could hire a good lawyer and come back.  My gun was a 20-25 Winchester rifle.''

The only exceptions taken to the admission of evidence are based on the admission of the dying declaration.

It is essential to the admissibility of dying declarations, and is a preliminary fact to be proved by the state, that they were made under a sense of impending death. This may be made to appear by the language of the declarant, or be inferred from his evident danger, or the opinions of his medical attendants stated to him, or from other circumstances of the case, such as the length of time elapsing between the making of the declarations and of his death, and the fact that the declarant was so weak that he could not sign his name, and so affixed his mark, all of which are resorted to, to ascertain the state of declarant's mind.

It is for the court to consider from the evidence whether a declaration was made under circumstances rendering it admissible as a dying declaration, and the credibility to be attached to a dying declaration is for the jury. Morris v. State, 6 Okla. Cr. 29, 115 Pac. 1030; Addington v. State, 8 Okla. Cr. 703, 130 Pac. 311; Updike v. State, 9 Okla. Cr. 124, 130 Pac. 1107; Hawkins v. State, 11 Okla. Cr. 73, 142 Pac. 1093; Carter v. State, 12 Okla. Cr. 236, 154 Pac. 337; Williams v. State, 13 Okla. Cr. 189, 163 Pac. 279; Allen v. State, 16 Okla. Cr. 139, 180 Pac. 564.

The preliminary proof in this case was clearly sufficient to warrant the conclusion of the court that the declaration was made under a sense of impending death and without hope of recovery. The statement of deceased was therefore properly admitted in evidence.

The instructions given by the court covered every phase of the case, and were exceedingly favorable to the defendant.

After a careful examination of the record we are satisfied that there was no error which could have been prejudicial to the defendant, and no one can read the evidence without being

impressed that the defendant has not been adjudged the degree of punishment he so richly deserves. Juries frequently render such verdicts, and this can only be accounted for upon the theory that the verdict was the result of a compromise of opinion. The judgment of the district court of Love county is affirmed.

MATSON and BESSEY, JJ., concur.