### TAYLOR DICK v. STATE.

No. A-3756.    Opinion Filed April 4, 1922.
(205 Okla. 516.)

(Syllabus.)

1.  **Homicide—Proof of Deceased's Realization of Impending Death as Sufficient Predicate for Admission of Dying Declaration.** Proof that decedent died within nine hours after he was shot, and that he stated to persons present "that he was killed, that he was going to die, that he fully realized his condition and was ready to die," and that he expressed no hope of recovery, sufficiently shows that decedent was conscious of impending death, and is in itself a sufficient predicate for the admission of his statements of the circumstances of the homicide as dying declarations.

2.  **Homicide—Evidence Sustaining Murder Conviction with Life Imprisonment.** In a prosecution for murder, evidence reviewed and held sufficient to sustain the conviction with imprisonment for life as the punishment.

Appeal from District Court, Coal County; J. H. Linebaugh, Judge.

Taylor Dick was convicted of murder, and he appeals. Affirmed.

Wylie Snow, C. M. Threadgill, and P. E. Whilhelm, for plaintiff in error.

S. P. Freeling, Atty. Gen., and E. L. Fulton, Asst. Atty. Gen., for the State.

DOYLE, P. J. Plaintiff in error, Taylor Dick, herein referred to as the defendant, was informed against for the murder of H. S. Stevens, alleged to have been committed in Coal county on or about the 17th day of June, 1919, by shooting him with a shotgun. The trial jury found him guilty of said charge, and fixed his punishment at imprisonment for life. From the judgment rendered upon the verdict he appeals.

The evidence shows that the defendant, a Choctaw Indian, lived on his wife's allotment, about six miles west of Lehigh. The deceased, a white man, lived on a small adjoining farm. Walter Cantrell had a lease on a part of said allotment. The deceased had fenced off about three acres of the land leased by Walter Cantrell, and used it for a pasture. On the day of the homicide the defendant told the deceased that he must either remove the fence and keep his stock out of the pasture or pay $1 per head for pasturage, and $5 for the time he had been using it. In the afternoon of the same day the defendant left his house, taking with him a shotgun, and went to this pasture and began to take down the fence and roll up the wire. While thus engaged near the house where the deceased lived, the deceased came out, and demanded to know what he was doing, and they had some words about his taking down the wire, and the defendant shot the deceased, the charge entering just below the groin, from the effects of which gunshot wound death resulted a few hours later.

Dr. W. E. Brown testified:

"I was called to attend H. S. Stevens; I found him lying in a wagon under a tree in the yard; he was suffering from a gunshot wound just below the groin on the left side; I applied a tourniquet to stop the flow of blood, and asked that they call other doctors to assist; I told Mr. Stevens his condition was

very serious and after Drs. Clark and Rushing arrived, we had a conference. They asked me to tell Mr. Stevens the gravity of his condition, which I did, and he said he fully realized it, and was ready to die, but for his family; it was then about 11 o'clock; we administered the anaesthetic; he never regained consciousness thereafter, and died a few hours later."

He was then asked what Mr. Stevens said as to the difficulty with Taylor Dick. Against the defendant's objections he answered that Taylor Dick wanted him to pay for the pasture; "I told him I would settle the next morning, and Taylor Dick said, 'You will settle now.' I grabbed the gun and pushed it down; as I did I was shot."

Roy Trow testified:

"I was there that night; Mr. Stevens asked me to bring him a drink of water, and Mr. Stevens said he was going to die, and I heard him tell his folks good-bye; that was about two hours before he was operated on."

Mrs. Martha Stevens testified:

"I am the widow of H. S. Stevens; I went as quick as I could and phone for the doctor; I asked my husband if he thought he would get well, and he said he never would get well, and called the children up to tell them good-bye; the little boy went up; the little girls would not go up, it hurt them so bad. He said that Taylor Dick came there, and wanted pay for the pasture, and he told him he would pay him; then Taylor wanted to shoot him, and he tried to push the gun away, and Taylor shot him."

S. S. Wood testified:

"I reached Mr. Stevens' house about 6 o'clock; he was lying in the wagon. I asked him if he thought he was seriously hurt, and he said he knew he was; that he was killed. I tried to encourage him, but he said he knew that he was going to die. He told me not to say anything to his folks about it. I asked him what the trouble came up about. He said it was over that little pasture out there; that Taylor told him that day that he had decided not to let him have the pasture

any longer; that he told Taylor as soon as he got the oats cut he would take the wire down. That evening he saw Taylor out there rolling up the wire, and he asked him what he was going to do with it. Taylor said he was going to roll it up and take it home, and asked me if I would give him the wire when the year was up and $5 in money right then, that I could have the pasture; that he said, all right, he would do that, and Taylor Dick picked up the gun; that he grabbed the gun, and he got hold of it with his hands, and pushed it down to keep him from shooting him in the breast, but did not get it down far enough.''

The defendant as a witness in his own behalf testified substantially as follows:

''I had a conversation with Mr. Stevens that day about 12. I said 'Mr. Stevens, Walter Cantrell told me you put the wire across that spot there, and he don't want your stock in there; what are you going to do, take it down or pay me for it?' He said, 'What do you charge for it?' I said, 'A dollar a head for stock in my pasture.' He said he would not pay that. I said, 'You will take your wire down, won't you?' He said, 'No; you take it down if you want to; Walter Cantrell told me to put it up there.' Then I went over to where Walter Cantrell was shocking oats, and said, 'Mr. Stevens says you told him to put that up there,' and Walter Cantrell said, 'I never told him such a thing; I don't want it up there.' That evening I told my wife that I believed I would take that wire. I went to the house and got my gun and went on until I came to this wire. I set my gun up against a post; it was a single-barrel shotgun, loaded with small shot. I took the wire loose from the corner post, and Mr. Stevens came up and said, 'What the hell are you doing?' I said, 'I thought I would take this wire down; if you will help me we can take it down in a few minutes.' He said, 'No; you go ahead; you are doing good;' and I started on with the wire. Then he said, 'Take your hands off that wire,' and he started to pick up my gun. I got the gun, and he grabbed it; I backed back, and the gun hung on the bib of my overalls, and the gun fired, and he fell with the gun in his hands. I stood there and looked at him while he was going

back to the house; then I picked up the gun. The land was my wife's and Walter Cantrell had rented it for that year.''

In rebuttal Walter Cantrell testified:

''Mr. Stevens' land adjoins the land I had rented; I gave Mr. Stevens permission to put that fence there as far as I was concerned; the defendant asked me that day if I gave Mr. Stevens permission to put the fence there, and I told him that I told Mr. Stevens to go ahead and put it there as far as I was concerned; I heard the defendant that day tell Mr. Stevens to take the fence down or pay him for the pasture, and Mr. Stevens said he would pay him for the pasture, and asked him how much he wanted. The defendant said, '$5 and the wire.' Mr. Stevens said, 'I have not the money to-day; I will have it right away.' The defendant said that if that wire was not taken down some one was going to heaven or somewhere else.''

The first contention made is that the court erred in admitting in evidence the declarations of the deceased. That the declarations of the deceased were properly admitted there can be no doubt. The fact that he was conscious of impending death is undisputed. There is no testimony tending to show that he had any hope of recovery.

The question of the admissibility of dying declarations has been passed upon by this court in numerous decisions. In the case of Morris v. State, 6 Okla. Cr. 29, 115 Pac. 1030, it is said:

''It is essential to the admissibility of dying declarations, and is a preliminary fact to be proved by the prosecution, that they were made under a sense of impending death. This may be made to appear from what the injured person said, or where from the nature and extent of his injuries it is evident that he must have known that he could not survive. It is sufficient if it satisfactorily appears that they were made under the sense of impending death, whether it be directly proven

by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical attendants, stated to him, or from other circumstances of the case, such as the length of time elapsing between the making of the declaration and his death, and the fact that the declarant was so weak that he could not sign his name and so affixed his mark, all of which are resorted to, in order to ascertain the state of declarant's mind.''

And see Addington v. State, 8 Okla. Cr. 703, 130 Pac. 311; Updike v. State, 9 Okla. Cr. 124, 130 Pac. 1107; Hawkins v. State, 11 Okla. Cr. 73, 142 Pac. 1093; Carter v. State, 12 Okla. Cr. 236, 154 Pac. 337. These authorities abundantly show that the court committed no error in admitting in evidence the declarations of the deceased.

It is also contended that the evidence does not support the conviction. The theory of the state was that the killing was done deliberately. The defense made was that the shooting was accidental. The undisputed evidence is that the altercation which resulted in this homicide was of the defendant's own seeking, and the result of his own unlawful acts. There was also evidence tending to show previous threats made by the defendant.

The other contentions made are not supported by any citation of authority. It is apparent that justice has been done, and the conviction ought not be reversed, except for some plain error in the proceedings which was or might be prejudicial to the substantial rights of the defendant.

After a very careful examination of the record we have failed to discover any such prejudicial error. The judgment of the trial court is therefore affirmed.

MATSON and BESSEY, JJ., concur.