# DENZIL CHASTAIN et al. v. STATE.

No. A-6936.　Opinion Filed Jan. 31, 1930.

(287 Pac. 826.)

Brett & Brett, Cargill & Whiteside, and Guy P. Horton, for plaintiffs in error.

J. Berry King, Atty. Gen., and V. P. Crowe, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiffs in error, hereinafter for convenience called the defendants, were charged by information with the crime of murder, and the defendant Denzil Chastain was convicted of murder and his punishment fixed at life imprisonment. The defendant Bert Pope was found guilty of manslaughter in the first degree and his punishment fixed at confinement in the state penitentiary for forty years. Each of the defendants filed a motion for a new trial, which was overruled, and his appeal was perfected by the filing of petition in error and case-made in this court.

The evidence on behalf of the state tends to show that on the first day of July, 1927, the two defendants went to a dance hall at a place called Lake Lahoma, in Jackson county, Okla.; in going to the lake the evidence tends to show they had gone to the home of one of the defendants and secured some beer to drink; the kind of beer is not disclosed by the record. The defendants were driving in a Ford car and were accompanied by Lanard Wilkerson, who testified for the state. When the defendants were preparing to leave the dance for their homes, Clyde Loftis came and told the defendants that Leslie Bellows would like to ride back to Blair, Okla., with them. The defendants told Loftis it was all right and the deceased left the dance hall with the defendants, in a one-seated Ford car, the deceased riding in the middle of the seat with the de-

fendants; the deceased told the defendants after leaving Lake Lahoma, where the dance was being held, that he wanted to go to Blair, but when they got to the road leading to Blair instead of turning in that direction they went on in another direction, and as the defendants stated, for the purpose of getting to the farm occupied by a man by the name of McClelland, where they desired to get some beer.

The evidence further tends to show that, after they had driven some distance, Leslie Bellows said something about wanting the defendants to turn on the road leading to Blair, and the defendants advised him they desired to go by the McClelland place, and the deceased said that it was all right with him for them to take him home after they had gone to the McClelland place.

The state called Lynn Gillispie as a witness who testified, in substance, that:

"The deceased came to my house; I saw he was hurt pretty bad and I called to my brother-in-law and told the women to get in the other room, and I took him in the house and put him to bed and saw his condition; he was pretty bloody; I noticed two wounds on his face was about all I could tell about; I had the ordinary lamplight; there was blood on his clothing; I went and called the deputy sheriff and the doctor at Blair; the deceased, I judge, was at my house about an hour; the doctor and Mr. Parks came and took him to Blair; the deceased walked out of the house."

The witness Gillispie then testified as to following the tracks down the road to where it is alleged the trouble took place. The witness stated:

"I learned the name of the deceased, who came to my house, was Leslie Bellows."

On cross-examination witness described the road from his home down to the place where they found the evidence of blood on the ground and stated:

"I could not tell how many tracks there were on both sides of the road, and in the middle; it looked like two different shoe tracks there on the east side of the road; it looked like the boy had lain across the east rut with his head in the middle of the road and his feet on the east side of the road; looked like a car had passed that point; when the Bellows boy came to my house he was pretty weak; I think he was conscious."

The witness was recalled, and after several questions, the following questions were asked the witness:

"Q. I will change that question and ask you to repeat any statement by Leslie Bellows to you, not what you said but what he said?

"Mr. Whiteside: I want to preserve the record if the court please. The defendant objects for the reason that the same is hearsay, incompetent, irrelevant and immaterial, and no proper predicate has been laid for the introduction of such testimony.

"Mr. Crowe: I think it is a part of the res gestae.

"The Court: I overrule the objection. Admitted as a part of the res gestae.

"Mr. Whiteside: Give us an exception.

"Q. Just tell the jury now what he said? A. He said the boys beat him up, made him suck them off; and he also said they lived at Altus; and said one of them had on a gray suit of clothing and the other a blue pair of pants.

"Mr. Whiteside: Give us an exception.

"Q. Will you state whether he made any statement to you as to the color of hair of either of the boys? A. Well, he said one of them——

"Mr. Whiteside: At this time, the defendants would like for this objection to the statements of this witness in relating as to what the deceased told him to go to all this line of testimony, and ask that our exceptions be saved.

"The Court: All right. All right, let the record so show.

"A. He said one of them was light complectioned and had light hair."

"I had gotten the deceased in the house at the time and I was taking his shoes off; I started taking them off immediately after I got him in the house; from the time he said 'hello' to me and directing my attention and got him in out there, and until I got him in the house where he made the statement, approximately it might have been three or four minutes."

The witness for the state, Dr. R. Z. Taylor, was recalled and stated that he went to the hospital and the deceased made a statement there; the witness stated he advised the deceased of his condition being near death, or in danger of losing his life. Witness Taylor was asked the following question:

"Q. Will you now relate as near as you can the statement made by Leslie Bellows, at the hospital, after you so advised him of his injuries, and the manner in which he had received them?

"Mr. Whiteside: We object to that for the reason that the same is incompetent, irrelevant and immaterial, and hearsay, and no proper predicate having been laid for the admission of the same.

"The Court: Overruled.

"Mr. Whiteside: Give us an exception.

"Q. Tell it as near as you remember, Doctor?

"Mr. Whiteside: This objection is made to all the statements made by the deceased, which this witness may relate, and give us an exception thereto.

"The Court: Let the record so show and the same ruling.

"A. Leslie Bellows said that he reached the dance hall—

"Mr. Whiteside: Pardon me just a minute, Doctor, you are now going to testify about what Les Bellows said there at the hospital, is that correct? A. Yes, sir.

"Mr. Whiteside: All right.

"Q. Go ahead. A. —about dark. That after the dance he left the grounds with two men whose names he didn't know but that the boy living on the Shield's place knew who they were. That he left—between these men.

"Q. Pardon me for interrupting, will you relate whether or not there was any statement made with reference to who made the arrangement for him to leave with them? A. Yes, sir, he said that the boy living on the Shields place told them to let him ride that he was all right, and that he got in the car to come by Blair as they went to Altus.

"Q. Did he tell you what kind of car? A. He said it was a Ford roadster with a three piece tire rack and truck or delivery body. He said that before leaving Lake Lahoma that they told him to strike a match and look in the bottom of the car, and he did, and that each or both men picked up 'hand-knuckles'; that a little piece, I don't remember the distance, from the dance hall, on the public road, while the car was moving that they made him suck them off, or I believe his words was suck their peters. He said that as he started that they hit him over the head and made him keep it up until he had sucked them both off.

"Mr. Whiteside: If the court please, I would like to ask one question. Doctor, was that statement made

which you are detailing reduced to writing by anyone as he was making the statement? A. Yes, sir.

"Mr. Whiteside: The defendant at this time objected to the Doctor testifying from memory for the reason that it shows that the same was reduced to writing, and if so that the best evidence in the absence of the showing of an impossibility of the production.

"The Court: Overruled.

"Mr. Whiteside: Give us an exception.

"A. —that they drove about ten miles on the public or main road and that he thought he was close to the old Shields place. That they got out of the car, and the man with the dark trousers on driving hit him. And that they caught his head and hit him on top of the head with knucks. And one said, 'Faster,' and he yelled or hollowed and that they told him to quit yelling; that they left him and came back and hit him three or four times, then left, and he looked and saw that they were gone.

"Q. Would you pardon me for interrupting, do you recall whether he made any statement as to what they said to him when they came back to where he was on the road, or anything said about killing him. A. Let's see if I can get the words to that. He said when they came back there one said, 'Kill that God damned son of a bitch,' or the equivalent to that, may not have been the exact words. He said he then went to a house to stay all night. As I remember he did not fully know the name of the people where he went. Going back a little, in one place he said they both hit him."

The state also offered what it termed the dying declaration of the deceased, which was admitted over the objection of the defendant, and described as State Exhibit A, which is as follows:

Questions by Dr. Taylor:

"Q. Leslie, what time did you get to Gillispie's this morning? A. About 2 o'clock.

"Q. Leslie, are you listening?   A.   I'm trying to.

"Q. Not very well?   A. As well as I can.

"Q. Leslie, we want to talk seriously to you now.   In a few minutes you are going on the operating table.   Did you know that you are in a bad shape?   A. Yes, sir.

"Q. Do you realize that in this work   we   have   to question you?   In a very few minutes, and before we do we want you to realize that you might not wake up.   Did you know that Leslie?   A.   I never thought of it.   It might happen.

"Q. Yes, it might happen.   We want you to realize that.   The reason we want you to realize that we are going to question you, the county attorney is going to question you about what happened.   We want you to realize that so that you will tell nothing but the whole truth. Do you realize that, Leslie?   A. Yes, sir.

"Q. Leslie, do you realize this might be your last day that you might not wake up?   A. Yes, sir, I want to tell everybody goodbye.

"Q. Alright, alright.   Listen, Mr. Yates, the County Attorney, is going to talk to you, and ask you to tell the truth about what happened from the time you got in the car until you got beat up.   A. Yes, sir.

"Q. All right.

Questions by L. B. Yates, County Attorney:

"Q. Your name is—   A.   Leslie Bellows.

"Q. You went up to—   A.  The dance hall.

"Q. Last night.   Where?   A. Lahoma Lake.

"Q. About what time did you go out there?   A.   I went out just about 8 o'clock.   I started when the sun hadn't hardly gone down.

"Q. Now, did you dance any?   A. No, sir.

"Q. Did you— About what time did you see these boys that you came back with? A. Right after the dance was over.

"Q. Did you see them before the dance was over? A. No, sir.

"Q. How came you to see them at that time? A. I was watching for a way to come home. I lived at Blair and they lived at Altus. They told them— The boys on Mr. Shield's place ask the two boys from Altus to let me ride. They said I was all right. If I wasn't all right I wouldn't want to ride with anybody.

"Q. Did you get in the car with the two boys? A. Yes, sir, set down in the middle.

"Q. In the front seat? A. Yes, sir.

"Q. Between the two boys? A. Yes, sir.

"Q. Did you know these boys? A. No, sir, one was named Jack and one Cicero, something like Cicero, I think it was Cicero.

"Q. Did they call one of them Jack? A. I am sure one was Jack and one Cicero. The last might be wrong but I know they called one of them Jack.

"Q. What kind of a car were they in? A. A Ford roadster with a three piece tire rack on the side of the car and a delivery body on the back of it.

"Q. Were they drinking any, Leslie? A. No, sir.

"Q. Did not drink anything last night? A. I never drank anything but some water.

"Q. You didn't drink any whisky or beer? A. No, sir.

"Q. Were these boys drinking you got in the car with? A. Yes, sir.

"Q. Did they drink any after you got in the car with them? A. No, sir. They began slapping me.

"Q. They both began slapping you around after you got in the car? A. Yes, sir. They says, 'You're a coward to strike a match and look in the bottom of the floor' and I says, 'I'm not.'

"Q. Did you strike the match? A. Yes, sir, I did.

"Q. What did you see when you struck the match, if anything? A. I saw hand knucks.

"Q. Just one? What then? A. I struck a match and looked down, then one boy grabbed one and one the other.

"Q. Where were you at that time? A. We were right there close to the dance hall.

"Q. Was the car going at that time? A. No, sir.

"Q. Was it stopped? A. Yes, sir.

"Q. Hadn't you ever started then? A. No, sir.

"Q. Did you— what did you think when they picked up the knucks? A. I thought they were just—I wasn't thinking about them jumping on me, I was just riding home with them.

"Q. Then they did start back to Altus? A. Started back to Altus and they made me suck their peter.

"Q. About how far did you get from the dance hall before they made you do that? A. About fifty yards.

"Q. Did you get off the main road? A. No, sir.

"Q. Did you stop in the middle of the road? A. No, sir. Stopped in the middle of the road, beat me in the head and hit me three or four times.

"Q. Then did they get out of the car? A. They was already out.

"Q. You were out too? A. Yes, sir, they made me get out, they beat me.

"Q. Were any cars coming by where you were stopped? A. Not that I noticed, not that I know of.

"Q. Did you ever get back in the car again after they beat you up? A. No, sir.

"Q. Where was it they got out of the car and beat you up? A. I think it was pretty close to old man Shield's place. It might not have been very close either but it seemed like it wasn't very far.

"Q. Had you been talking to them? A. No, sir, I didn't tell a word to them. Sam Wilson told them to get out of there in the first place.

"Q. Had you turned off the main road when they stopped and told you to do that? A. No, sir, I wouldn't do that for a hundred dollars right now.

"Q. No. Had you been in the car some little bit before the boys mentioned it? A. No, sir, the only time we got in the car was when we started off.

"Q. About how many miles had you gone before you got out? A. I guess ten miles.

"Q. Before you got out? A. Yes, sir.

"Q. Now you stated about them beating you. Did they beat you any before you got out of the car? A. Some.

"Q. What did you do when they would hit you? A. Try to dodge them and tell them to quit but they wouldn't do it.

"Q. Leslie, after you stated they had gone about ten miles then did you get out of the car? A. Yes, sir.

"Q. What was the first thing they did after they got out of the car? A. I started out of the car and they hit me in the head with the knucks.

"Q. Was that the one driving the car that did that? A. Yes, sir.

"Q. What else? A. They said they were going to kill me, anyway.

"Q. They said they were going to kill you, which one said that? A. Both of them.

"Q. After they got out of the car what was it they said to you? A. They just grabbed me around the neck and never said a word and hit me right on top of the head, they hit me on top of the head again, and said, 'Faster, faster,' and I said, 'Oh,' and they said, 'Quit that yelling, quit that yelling.'

"Q. Did they say anything else to you then? A. No, I don't think so, only Bert Wallace, one thing he said—

"Q. Wait a minute. After you got out of the car what was they made you do if anything? A. The only they hit me in the head.

"Q. You said something they made you do? A. Made me suck them. The one driving the car said, 'Stay with it.'

"Q. Which one was that? A. The driver.

"Q. The one they called Jack? A. The one with the blue serge pants. The other had on a grey suit.

"Q. Did both of them make you suck them? A. Yes.

"Q. Where were you at the time, out on the road? A. In the car.

"Q. You were in the car? A. Yes, sir, I forgot this, I started to sucking and this other boy got the knucks and hit me on the head and I stopped and then they hit me again.

"Q. Did they make you go ahead and finish? A. Yes, sir.

"Q. Which one of them hit you? A. The one that was driving with the blue pants on.

"Q. I believe you stated they hit you with the knucks? A. That was the one that was driving.

"Q. Did the other one hit you with the knucks? A. Yes, sir, two or three times, they both hit me with the knucks.

"Q. Did either one have a knife? A. Not that I know of, but they stole mine. It was a green handle with an 'S' on one side of it. I want it for my brother gave it to me before he went to California.

"Q. Well, I'll find it for you if I can. Now, after they beat you up what did they do to you? A. I was laying there so numb I don't know what they was doing only I saw them leave.

"Q. Did they come back and threaten to kill you? A. Yes, sir. They hit me two or three times, then went to the car, then came back and threatened to kill me before they left.

"Q. Then they did leave? A. Yes, sir.

"Q. Did you hear either one of them say anything about your condition, about whether you were dead? A. No, sir.

"Q. But you were pretty numb? A. Yes.

"Q. Did they say anything about finishing you up when they came back? A. Yes, sir, they did.

"Q. What did they say about that, Leslie? A. Jack, that had on the blue suit said, 'That God damn son of a bitch, I'll kill you in a minute.' He'll kill anybody.

"Q. Who said that? A. The other one said that Jack would do that. They didn't kill me but just the same as dead, that is the way I felt.

"Q. Then did the boys leave you out there? A. Yes, sir, I looked around to see where they were.

"Q. And they were gone? A. Yes.

"Q. What did you do after they left? A. I got up and went to the other place and tried to stay all night.

"Q. Did they let you come in?   A. Yes, sir.

"Q. You know whose place it was?   A. I know but I can't think.

"Q. Was it Gillispie's?   A. Gillispie or Lispie.

"Q. Did you see any other house as you went down the road?   A. I never noticed.

"Q. Leslie, did you see these boys drinking any beer or whisky before or after they left the dance?   A. No, sir, but I could smell it on them right strong as soon as they walked up.

"Q. I guess that's all."

The testimony on behalf of the state further shows the deceased left the dance hall at Lake Lahoma with the defendants and later in the night came to Lynn Gillispie's place badly beaten up. The defendants testify in their own behalf and admit that they went to Lake Lahoma dance hall; they state that on their way there they drank a bottle of beer each; that while there they danced one or two dances and about the time they were ready to start home, Clyde Loftis came to them and asked if they would let the deceased ride in their car to his home at Blair, and they agreed to do so; they deny they compelled the deceased to commit the outrageous crime the state attempts to show in what is termed the dying declaration of the deceased. The defendants admit the deceased wanted them to take him home to Blair and they told him they were going to McClellands to get some more beer and that they would take him home.

The defendant Chastain claims they drove on some distance when they discovered something wrong with one of the front wheels of the car, and that he got out and looked at it, and then started to get back in the car:

"I started to get my hat out of the tool box and deceased Bellows was standing back near the hind wheel; I did not notice when he got out of the car; he got out some time after I got out; I was reaching in the tool box to get my hat out of the box and the deceased said he wanted us to take him home, and I told him I would take him as soon as we went to the McClelland place, and he said, 'By God, I will make you take me home,' and ran at me and I grabbed him and kept him from striking me; I had a jack in the tool box and I was bringing it up and hit him; he had a knife in his hand; when I struck him he fell against the car on the east side; we had a fight there when he said he was going to make me take him home and ran at me with a knife; I pulled the jack out of the box I was bending over to get my hat, and struck at him when he ran in to me; he fell, and was lying over the rut on the east side of the road with his head toward the west, partly under the car and behind the wheel; I do not know what became of the deceased; I was standing there talking to Bert Pope; Bert asked me what we were going to do with him and while we were trying to decide what to do with him, why he got up and went off. He was behind the car and we were standing in front and on the east side; I waited a few minutes thinking he might be coming around the end of the car and then stepped back and could not see him; I never saw him any more that night; we got home about 1 :15."

The defendant denied any mistreatment of the deceased, or compelling him to do anything, or having any trouble with him up to the time he claims he stopped the car to look at the car wheel to see what was wrong with it. Defendant Chastain claims he struck the deceased with a jack in self-defense to keep him from cutting him with a knife.

The defendant Bert Pope testified in substance to the same as did the defendant Denzil Chastain; denying any mistreatment of the deceased, or having any trouble with

him until the car stopped, to look at the wheel to see if anything was wrong with it. The defendant Pope admits that the defendant Chastain struck the deceased with a jack; he states he had nothing to do with it, took no part in it, and admits they left the scene of the difficulty without making any effort to find the deceased, or report the same to any one.

The record is voluminous and to set out the testimony in detail would make this opinion too lengthy.

The defendants have assigned sixteen errors alleged to have been committed by the court in the trial of their case. We will first consider the tenth assignment, which is as follows:

"Because the court erred in admitting in evidence certain alleged statements alleged to have been made by the deceased to one Lynn Gillispie, to which testimony and admission of the same, the defendants and each of them objected and excepted at the time."

It is urged by the defendants, that the testimony of Lynn Gillispie, which goes to the statements claimed to have been made by the deceased at the witness Gillispie's house, detailing the way the difficulty occurred, and what the deceased claims each party of the difficulty did and said, which was admitted as being statements made in the absence of the defendants, and the defendants insist that the statements made were not a part of the res gestae. The record discloses that this conversation was admitted by the court on the theory that it was a part of the res gestae, having been made within a few minutes after the assault was made upon the deceased. The defendants cite in support of their contention the case of Smith v. Territory, 11 Okla. 669, 69 Pac. 805, 806, the seventh syllabus being as follows:

"Declarations, to become a part of the res gestae, must accompany the act which they are supposed to characterize and explain, and, to make such declarations competent as evidence, they must exclude the idea of a narration of past occurrences or events."

In Price v. State, 1 Okla. Cr. 366, 98 P. 447, this court in the second paragraph of the syllabus, said:

"Declarations, to be a part of the 'res gestae,' need not be precisely coincident in point of time with the principal fact. If they spring out of it, shed light upon and tend to explain it, are voluntary and spontaneous, and are made at a time so near it as to preclude the idea of deliberation or fabrication, then they are to be regarded as contemporaneous, and are admissible as evidence."

The record in this case discloses that a difficulty occurred, something like a quarter of a mile from the home of the witness Lynn Gillispie, and that some time after midnight, the deceased came to the Gillispie home, called him, and when he went out he found the deceased badly beaten, scarred and bleeding, suffering with pain, and when questioned as to how he received his wounds, the deceased detailed to the witness how it occurred; he could not tell just where they were at the time of the difficulty, but it is apparent from the record that when he left the scene of the difficulty he was in a dazed condition, suffering from pain, and was bleeding profusely, as the testimony shows that blood was found at different places along the route traveled by the deceased from the scene of the difficulty to Gillispie's home.

The question for this court is, considering all the facts and circumstances, Was the condition of the deceased such as to preclude deliberation and fabrication of the story told the witness? It is urged by the defendants that the statements, attributed to the deceased by Gillispie, were not spontaneous deliberations springing out of, and

contemporaneous with the principal facts sought to be proven, and were not made at a time so near to as to preclude deliberation and fabrication, and that the rule is that these elements must accompany the statements, whether the statements are made by the deceased or by the defendant. The defendants' contention is that a sufficient time had elapsed, between the time of the ending of the difficulty and the arrival of the deceased at the Gillispie home, to give the deceased time to deliberate and fabricate statements as to the facts. It cannot be definitely determined how long after a crime has been committed statements made by a party cease to be a part of the res gestae.

In Clingan v. State, 15 Okla. Cr. 483, 178 Pac. 486, in the third paragraph of the syllabus the court said :

"Spontaneous declarations springing out of and contemporaneous with the principal fact sought to be proven, and which are made at a time so near to it as to preclude the idea of deliberation and fabrication, whether they be declarations of a deceased or of a defendant or of bystanders, are admissible as part of the 'res gestae'."

In Morehead v. State, 12 Okla. Cr. 62, 151 Pac. 1183, 1184, Ann. Cas. 1918C, 416, in the sixth paragraph of the syllabus the court said:

"On a trial for murder, declarations of the deceased made under such circumstances as will raise the reasonable presumption that they are the spontaneous utterances of thought created by or springing out of the homicidal act, and made so soon thereafter as to exclude the presumption that they are the result of premeditation and design, and without knowledge of which the principal fact might not be properly understood, are admissible as part of the res gestae."

In the body of the opinion this court said:

"No fixed measure of time or distance from the main occurrence can be established as a rule to determine what shall be a part of the res gestae. Each case must necessarily depend on its own circumstances to determine whether the facts offered were really part of the same continuous transaction."

And further on the court says:

"The rule is well stated that: If such declarations 'are made under such circumstances as will raise the reasonable presumption that they are * * * created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the result of premeditation and design, they will be admissible as part of the 'res gestae'."

In Dodd v. State, 29 Okla. Cr. 311, 233 Pac. 503, the first paragraph of the syllabus is as follows:

"It is not possible to define the term 'res gestae' by any exact definition which will fit all cases. The term in a general way may be defined as the circumstances, facts, and declarations which grow out of the main fact and shed light upon it and tend to explain it, are voluntary and spontaneous, and made at a time so near, either prior or subsequent to the main act, as to exclude the idea of deliberation or fabrication."

In Cook v. State, 27 Okla. Cr. 215, 226 Pac. 595, this court in the first paragraph of the syllabus states as follows:

"Hearsay evidence may be admissible as a part of the res gestae. One of the recognized exceptions to the rule that hearsay evidence is not admissible is where spontaneous statements or exclamations are made by an injured person, declaring the circumstances of the injury, where such statements are made immediately after the injury or during such indefinite time thereafter as the stress of pain, fear, or excitement prevents the reflective faculties of the narrator to control, so that the utterances are spon-

taneous and in direct response to the sensations produced by the physical shock or mental excitement. The utterances, to come within the exceptions to the rule, must be under the uncontrolled domination of the senses, so near in point of time that considerations of self-interest and reflection could not have been fully restored."

In this case the witness fixes the time the deceased arrived at his house, and it would seem from the distance the deceased traveled to reach the home of the witness Gillispie, would not require more than thirty or forty minutes, and the declaration as to what occurred at the time, under the circumstances, we believe effectually excludes the presumption that they were the result of premeditation or design, and that such statements as made by the deceased to the witness Gillispie were of the very highest importance in the case, and that the court did not err in admitting the evidence of the witness Gillispie as to the statements made by the deceased.

It is next urged by the defendants in their ninth assignment of error, that the court committed error in permitting the state to introduce evidence pertaining to the alleged dying declaration made by the deceased; that the action of the court in admitting the statement as a dying declaration and testimony as to what was said by the deceased at the time the dying declaration was reduced to writing was prejudicial to the rights of the defendants; and the defendants urge that the statement was not the statement of the deceased but the dictation of the county attorney, at least in some particulars. The defendants insist that the statements were not made under a sense of impending death and without a hope of recovery of the deceased at the time such declarations were made, and should not have been admitted in evidence; citing Bilton v. Territory, 1 Okla. Cr. 566, 99 Pac. 163, in support of

their contention. The third paragraph of the syllabus in that case reading as follows:

"In order to render dying declarations admissible, it must be shown that the declarant was not only in articulo mortis, but under the sense of impending death, without hope of recovery, at the time such declarations were made."

And the defendants then urge at length the questions that were propounded to the deceased, and the answers by the deceased such as to show that they were not intended to be admitted as dying declarations. The defendants cite in support of their contentions, the case of Peoples v. Smith, 164 Cal. 451, 129 Pac. 789; Wratislaw v. State, 18 Okla. Cr. 150, 194 Pac. 273.

The record in this case shows that the written dying declaration of the deceased was taken during the morning of the day he died; that immediately after the conclusion of the taking of the statement he was taken to the operating table and given an anaesthetic and never regained consciousness. The record further shows that the wounds inflicted upon the deceased were fatal wounds, from the effects of which he died. That the deceased was advised by the attending doctor that he would soon be placed on the operating table and might not wake up, and deceased said he wanted to tell everybody good-bye.

In Canty v. State, 20 Okla. Cr. 114, 201 Pac. 531, the second and third paragraphs of the syllabus are as follows:

"It is the province of the court to determine, in the first instance, the admissibility of declarations offered in evidence as dying declarations."

"Where it is shown that deceased had been advised by the attending physician, and that the advice was such as to induce in his mind a belief that recovery was impos-

sible and death impending, a declaration, made by deceased after he had been so advised, is admissible as a dying declaration."

In McClendon v. State, 36 Okla. Cr. 11, 251 Pac. 515, the first paragraph of the syllabus is as follows:

"To warrant the admission of a statement as a dying declaration, it is not essential that there be an express declaration that declarant is going to die, or that he has no hope of recovering. It is sufficient if it satisfactorily appears that * * * he could not survive, whether it be directly proven by the express language of the declarant or from the other circumstances of the case, such as the nature and extent of the injuries, his evident danger, the opinion of medical attendants, stated to him, or the length of time between the time of statement and death."

In the body of the opinion it is said:

"It is not essential that there be an express statement that declarant is going to die or that he has no hope of recovery. If the circumstances, the nature and extent of the injuries, his evident danger, or the opinion of medical attendants, stated to him, or other circumstances, such as the length of time between the time of the statement and death, make it evident that he believed he could not survive, they are sufficient to make the declaration admissible. Under this rule, announced many times by this court, the statement was properly admitted as a dying declaration. Hawkins v. State, 11 Okla. Cr. 73, 142 Pac. 1093; Poling v. State, 12 Okla. Cr. 27, 151 Pac. 895, Ann. Cas. 1918E, 663; Allen v. State, 16 Okla. Cr. 136, 180 Pac. 564."

It is a universal rule that before dying declarations can be admitted in evidence, it must appear that they are made under a sense of impending death, but it is not necessary that the person making them state at the time they are made he is going to die, as that fact may be proven, not only by what the declarant said but also by his con-

dition, by the nature or extent of his wounds, or from his conduct, or other circumstances of the case. We hold that the court properly admitted the statements of Dr. Taylor and the statements of the deceased reduced to writing a few hours prior to his death as dying declarations.

The defendants urge in their fourth assignment of error the misconduct of one of the jurors sufficient to entitle them to a new trial. Where it is claimed there is misconduct by a juror, by reason of separation or having conversation with some one before the case is finally submitted, the burden is on the defendant to show that he suffered some prejudice by reason of the separation. Chappell v. State, 44 Okla. Cr. 267, 280 Pac. 639, and cases therein cited.

There is nothing in the record to show that the rights of the defendant were in any way whatever prejudiced, by the conversation had by one of the jurors with a friend as the jurors were being taken in to a restaurant to get their meal, therefore this contention is without merit.

The defendants urge that the court should have sustained their motion for a new trial. After a careful examination of the record we find that the facts in the case, if believed by the jury, were sufficient to sustain the verdict. If the facts in this case are true, these defendants are guilty of conduct unworthy of the respect of any good citizen, and they are guilty of wantonly and wilfully taking the life of a poor unfortunate weak-minded boy.

There are other errors assigned but they are not considered of sufficient merit to warrant this court to reversing this cause. After a careful study and reading of the record in this case, we fail to find any error prejudicial to the rights of the defendants of sufficient merit to reverse the case. The defendants were accorded a fair and

impartial trial; the court substantially instructed the jury as to the law applicable to the facts in the case. No fundamental or prejudicial errors appearing in the record, the judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.